Julie B. Porter (*pro hac vice* admission pending)
porter@spplawyers.com
Jennifer B. Salvatore (*pro hac vice* admission pending)
salvatore@spplawyers.com
Sarah S. Prescott (CA Bar No. 231753)
prescott@spplawyers.com
Attorneys for Plaintiff
Salvatore Prescott & Porter, PLLC
1010 Davis Street
Evanston, IL 60201
Telephone:  312-283-5711
Fax:  312-724-8353

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ROSE MCGOWAN,<br>        Plaintiff,<br><br>    vs.<br><br>HARVEY WEINSTEIN, DAVID BOIES, BOIES SCHILLER FLEXNER LLP, LISA BLOOM, THE BLOOM FIRM, B.C. STRATEGIES LTD. D/B/A BLACK CUBE,<br>        Defendants. | Case No. 2:19-cv-9105<br><br>**COMPLAINT**<br>1. Civil RICO, 18 U.S.C. § 1962(c)<br>2. Civil RICO, 18 U.S.C. § 1962(d)<br>3. Federal Wiretap Act, 18 U.S.C. § 2520<br>4. Fraudulent Deceit, Cal. Civ. Code § 1709<br>5. Common Law Fraud<br>6. Bane Act, Cal. Civ. Code § 52.1<br>7. Invasion of Privacy<br>8. Computer Crimes, Cal. Civ. Code § 502(e)(1)<br>9. Conversion<br>10. Intentional Infliction of Emotional Distress<br>11. Negligent Hiring and Supervision<br><br>**DEMAND FOR JURY TRIAL** |

1

1    Plaintiff ROSE MCGOWAN, by and through her counsel, Salvatore Prescott

2   & Porter, PLLC, brings this Complaint against Defendants HARVEY WEINSTEIN,

3   DAVID BOIES, BOIES SCHILLER FLEXNER LLP, LISA BLOOM, THE

4   BLOOM FIRM, and B.C. STRATEGIES LTD. d/b/a BLACK CUBE, and states as

5   follows:

6                        **JURISDICTION AND VENUE**

7    1.    This Court has subject-matter jurisdiction over Plaintiff's federal

8   claims, arising under the laws of the United States, pursuant to 28 U.S.C. § 1331 and

9   18 U.S.C. § 1964, and has supplemental jurisdiction over Plaintiff's state-law claims

10  pursuant to 28 U.S.C. § 1367, because they are related to the federal claims and form

11  part of the same case or controversy.

12   2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because

13  a substantial part of the events giving rise to the claims occurred in this district.

14  Venue is further proper in this district pursuant to 18 U.S.C. § 1965, because: (a)

15  Defendant WEINSTEIN has agents and transacts his affairs in this district; (b)

16  Defendants BOIES and BOIES SCHILLER FLEXNER LLP have agents and

17  transact their affairs in this district; (c) Defendants BLOOM and THE BLOOM

18  FIRM reside, have agents, and transact their affairs in this district; and (d) Defendant

19  B.C. STRATEGIES LTD. d/b/a BLACK CUBE has agents and transacts its affairs

20  in this district.

**BACKGROUND**

3.     This case is about a diabolical and illegal effort by one of America's most powerful men and his representatives to silence sexual-assault victims. And it is about the courageous women and journalists who persisted to reveal the truth.

4.     Defendant HARVEY WEINSTEIN, the disgraced former movie mogul and Hollywood power broker, raped plaintiff ROSE MCGOWAN many years ago, when MCGOWAN was a young, up-and-coming actress with lead roles in two WEINSTEIN-produced films. Back then—as WEINSTEIN had done with other women he assaulted or otherwise abused—WEINSTEIN paid MCGOWAN money as a settlement and expected her to go away and keep her mouth shut.

5.     MCGOWAN was not the only woman whom WEINSTEIN harmed. As years progressed, the sexual-abuse trail grew longer, and the risks mounted. WEINSTEIN enlisted others—including his co-Defendants in this case—as co-conspirators, all working with a single mission: to protect WEINSTEIN's reputation, suppress negative information about him, and silence and discredit his accusers.

6.     This included MCGOWAN, who was one of the first women publicly to disclose WEINSTEIN's abuse. In 2016, nearly two decades after WEINSTEIN raped her, MCGOWAN began working on a memoir and motivational book called *Brave*, which HarperCollins published in January 2018. The book was not all about WEINSTEIN; it was about MCGOWAN's life, including challenges throughout her

childhood and as a young woman. To be sure, however, MCGOWAN intended to write about the painful episode in her life involving WEINSTEIN. She intended to describe the rape, in detail, and to discuss how WEINSTEIN's conduct toward her and others poisoned the film and television industry.

7.     When WEINSTEIN learned of MCGOWAN's plans, he tapped into his team of fixers. The goal was to ensure that MCGOWAN's story never saw the light of day, and—if it did—that no one would believe her. WEINSTEIN did not limit his efforts to MCGOWAN. As he had already been doing for years, he relied on co-conspirators, including Defendants, to seek and suppress information about other women who might reveal his misconduct, harm his reputation, and potentially report his sexual assault—women who, as MCGOWAN was preparing to publish *Brave*, were increasingly opening up to reporters investigating WEINSTEIN.

8.     WEINSTEIN's campaign against MCGOWAN and others involved some of the most powerful forces that money could buy. He enlisted prominent, media-savvy representatives DAVID BOIES and LISA BLOOM. He hired the international spy agency, BLACK CUBE. Together, they worked in concert for more than a year to silence WEINSTEIN's victims and the journalists who were reporting WEINSTEIN's abuses. With MCGOWAN specifically, Defendants tried steal MCGOWAN's unpublished book, attempted to buy MCGOWAN's silence, and planned—in the event that they could not intimidate MCGOWAN into withholding

4

her book—to undermine MCGOWAN's reputation, such that she would not be believed. As part of this effort, Defendants engaged in illegal activity, including violation of state and federal laws.

9.     MCGOWAN has suffered tremendously from Defendants' conspiracy and lies. Her book sales suffered; her expenses mounted; her job opportunities vanished; and her emotional health cratered. She has experienced trauma and depression from Defendants' actions, and the deep betrayal will have life-long effects.

## PARTIES

10.     ROSE MCGOWAN is an artist and activist. MCGOWAN has starred in feature films and acclaimed television shows. She has written a memoir, *Brave*, directed a short film, *Dawn*, and received multiple awards and accolades. Her work in exposing sexual assault and harassment in the media industry earned her recognition as one of the women *Time* magazine dubbed "The Silence Breakers," naming MCGOWAN and others whose actions launched the #MeToo movement as Person of the Year in 2017.

11.     HARVEY WEINSTEIN co-founded film and television distribution company Miramax, LLC in 1979, which became one of the world's largest independent film distribution and production companies. In 2005, WEINSTEIN left Miramax and co-founded The Weinstein Company, another independent film studio.

WEINSTEIN regularly conducted business in California through his role in The Weinstein Company.

12.    DAVID BOIES is an attorney who is both a high-stakes litigator and someone who serves clients in non-legal roles such as reputation management. He has served as the Chairman and a Managing Partner of the law firm BOIES SCHILLER FLEXNER LLP since he co-founded it in 1997. He also founded a film-production company based in California called the Boies/Schiller Film Group. BOIES regularly conducts business in California.

13.    BOIES SCHILLER FLEXNER LLP is a national law firm co-founded by DAVID BOIES. BOIES SCHILLER FLEXNER has offices in approximately 15 locations in the U.S. and London, including Los Angeles, CA and Santa Monica, CA. All acts by DAVID BOIES described in this Complaint are acts that BOIES engaged in as an agent for BOIES SCHILLER FLEXNER, within the scope of his authority as a firm partner.

14.    LISA BLOOM is an attorney licensed to practice in California who also is a television commentator and serves clients in multiple capacities, including in non-legal roles such as reputation management. She is THE BLOOM FIRM's founder and has been admitted to practice in California since 1992. BLOOM resides in and regularly conducts business in California.

15.    THE BLOOM FIRM is a civil-rights law firm, with offices and attorneys in Woodland Hills, CA and Oakland, CA. All acts by LISA BLOOM described in this Complaint are acts that BLOOM engaged in as an agent for THE BLOOM FIRM, within the scope of her authority as the firm's owner.

16.    B.C. STRATEGIES LTD. d/b/a BLACK CUBE, registered as BC Strategy Ltd., is a private intelligence agency based in London, England, Tel Aviv, Israel, and Madrid, Spain. BLACK CUBE was founded in 2010 by former Israeli intelligence officers. The company provides intelligence and advisory services to clients internationally. BLACK CUBE agents regularly conduct business in California, including meeting with MCGOWAN in and around Los Angeles, CA.

## FACTS

***The rape***

17.    In 1997, at the Sundance Film Festival, WEINSTEIN raped MCGOWAN.

18.    At the time, MCGOWAN was a budding star with lead roles in two WEINSTEIN-produced films, and WEINSTEIN was an established power broker in the film industry. Indeed, at the time WEINSTEIN assaulted MCGOWAN, she was filming her second Miramax project; WEINSTEN was her boss when he summoned her to his room for what she believed would be a work-related discussion.

7

19.     Though there were whispers of WEINSTEIN's penchant for harassing young actresses and his company's female employees, the world was a very different place more than 20 years ago. Discouraged from pursuing legal claims, MCGOWAN signed a settlement agreement with WEINSTEIN and sought to move on with her career.

20.     What MCGOWAN did not know at the time was that she was hardly WEINSTEIN's only victim. WEINSTEIN was a bully, a manipulator, a liar, and a prolific harasser.

21.     WEINSTEIN exercised power over many in the movie business, including vulnerable women. WEINSTEIN was well known for making or breaking careers, and he could personally end dreams of stardom for those who crossed him.

***DAVID BOIES:  WEINSTEIN's enabler***

22.     WEINSTEIN did not operate in total secret, however. A select group not only knew of WEINSTEIN's misconduct, but also enabled it and helped it continue.

23.     One key figure in WEINSTEIN's inner circle was DAVID BOIES. BOIES has worked with WEINSTEIN in various capacities since approximately 2001. In 2004, WEINSTEIN's Miramax Books published BOIES's memoir, *Courting Justice*.

24.     WEINSTEIN and BOIES attended film openings, charity events, and political fundraisers together. BOIES's personal interests increasingly overlapped with WEINSTEIN's businesses, and the relationship evolved beyond usual attorney-client boundaries. For example, within a year after BOIES shared with WEINSTEIN a copy of an obscure 2011 movie in which BOIES's daughter Mary Regency played a minor role, Regency appeared in a major film that WEINSTEIN produced. That same year, BOIES formed a production company, the Boies/Schiller Film Group, as a vehicle for his daughter and the actor-son of one of BOIES's law partners. Over the years, BOIES and the Film Group did business with WEINSTEIN's company—investing millions of dollars—and WEINSTEIN provided invaluable favors for BOIES, including providing financial support to a film that Regency was directing when that film's production was in jeopardy.

25.     From their relationship's very beginning in 2001, BOIES regularly performed reputation-management engagements for WEINSTEIN, such as intervening on WEINSTEIN's behalf to try to kill negative stories about WEINSTEIN. For example, BOIES guided WEINSTEIN in convincing *The New Yorker* as early as 2002 not to publish stories about WEINSTEIN's alleged 1998 sexual assault of a former Miramax employee.

26.   Again, in 2015, when criminal charges were levied against WEINSTEIN, BOIES stepped in, and he worked to discredit the victim and convince reporters not to publish a story about WEINSTEIN's sexual-abuse history.

**MCGOWAN speaks out**

27.   As MCGOWAN continued working as an actress, she grew more frustrated and outraged at the complicity that allowed WEINSTEIN and men like him to operate with impunity in Hollywood. As long as they made hit movies, and the movies made money, others were content to turn a blind eye to the rampant harassment of women in the industry. But MCGOWAN began to push back and find her voice.

28.   MCGOWAN decided to write a book about her life, including struggles in her childhood and young adulthood. She wanted to encourage others to take heart and gather courage to stand up, speak out, and be "Brave."

29.   In a chance encounter that, in retrospect, seems more than a coincidence, in or around May 2016, MCGOWAN met Lacy Lynch while they were both waiting for a flight at the Newark Airport. Lynch introduced herself as a literary agent and expressed admiration for MCGOWAN's work. MCGOWAN, who had recently terminated her prior literary agent and was looking for someone to help guide her through the process for releasing her book, was charmed.

30.     Lynch introduced MCGOWAN to her boss, Jan Miller, Founder and CEO of Dupree Miller & Associates, and the three women agreed that Dupree Miller would represent MCGOWAN in her efforts to promote her account of misconduct by men in the entertainment industry, including WEINSTEIN.

31.     On or about June 2, 2016, MCGOWAN publicly announced that she was writing a memoir that would expose Hollywood's misogyny. She tweeted, "You are officially on notice. my book is called BRAVE and I am here to settle a score." Her tweets set off a wave of speculation within the industry about what and whom MCGOWAN intended to expose.

32.     On or about October 13, 2016, MCGOWAN published more tweets regarding her plans, further igniting speculation about her book. She wrote, "it's been an open secret in Hollywood/Media & they shamed me while adulating my rapist," with the hashtag #WhyWomenDontReport. She also wrote, "Because my ex sold our movie to my rapist for distribution," and she concluded with, "It is time for some goddamned honesty in this world."

33.     Although MCGOWAN did not name WEINSTEIN in her public messages, it was widely believed that MCGOWAN was referring to WEINSTEIN and intended to reveal damaging information about him in her book.

***Hiring BLACK CUBE***

34.     On or about October 16, 2016—just days after MCGOWAN's tweets about exposing her rapist—WEINSTEIN sought out BOIES for his assistance in doing what the two had done many times before: silencing WEINSTEIN's accusers.

35.     When WEINSTEIN learned of MCGOWAN's book and her desire to expose him, he put a plan in motion to bury it, just as he had with other sexual-assault allegations (including the 2015 criminal allegations against him by model Ambra Battilana Gutierrez). To do so, WEINSTEIN mobilized his team of experts in investigations, intelligence, and media messaging to launch a multi-pronged attack on MCGOWAN and other accusers.

36.     On or about October 24, 2016, as part of an agreement with WEINSTEIN to silence and discredit MCGOWAN and other potential accusers, BOIES, through BOIES SCHILLER FLEXNER, hired BLACK CUBE, an Israeli intelligence agency.

37.     BLACK CUBE had been founded in approximately 2010 by two veterans of a secret Israeli intelligence unit. Although the agency's agreements with clients stated that attorneys vetted its tactics and that it would conduct itself lawfully, it was well known that BLACK CUBE played dirty and used illegal and unethical tactics. By the time BOIES SCHILLER FLEXNER hired BLACK CUBE, there was public information that BLACK CUBE operatives, including owner Avi Yanus,

were under investigation for using illegal methods, such as hacking email accounts, and that some had even been charged criminally.

38.     The specific purpose of the contract that BLACK CUBE and BOIES SCHILLER FLEXNER signed was "to identify the entities behind the negative campaign against the Client"—WEINSTEIN—"and support the Client's efforts to put a stop to it." BOIES SCHILLER FLEXNER's engagement of BLACK CUBE was solely to silence WEINSTEIN's accusers and protect WEINSTEIN's reputation.

39.     The contract was for $200,000 and provided for performance bonuses, including $200,000 if BLACK CUBE was successful in "putting a stop to the negative campaign."

40.     On or about October 28, 2016, BOIES SCHILLER FLEXNER sent BLACK CUBE $100,000 by interstate wire transfer, as payment on the contract.

41.     Within days, a BLACK CUBE agent posing as "Anna" reached out to reporter Ben Wallace from *New York* magazine. Wallace had been investigating WEINSTEIN for approximately six weeks. Anna said that she had a story about WEINSTEIN but was grappling with whether to tell it. Wallace met with her twice. Over the course of the two meetings, Wallace grew increasingly suspicious, because Anna seemed to be pushing him for information about the status and scope of his inquiry and his interviewees. During the second meeting, Anna requested that she

1   and Wallace sit close together, leading Wallace to suspect that she might be

2   recording him.

3   ***MCGOWAN's script and early efforts to record MCGOWAN***

4       42.   In addition to working on *Brave*, MCGOWAN was also developing a

5   script for a television series. MCGOWAN noticed that the head of California-based

6   Amazon Studios, Roy Price, had started following her on Twitter. MCGOWAN

7   reached out to Price and told him about her screenplay. He was receptive. In or

8   around October 2016, Price caused Amazon Studios to purchase MCGOWAN's

9   screenplay. Once Amazon Studios purchased the rights to her intellectual property,

10  MCGOWAN no longer had the right to work with others to get the series made.

11      43.   MCGOWAN did not know at that time that Price had a close

12  relationship with WEINSTEIN and was working on a $230 million deal with The

13  Weinstein Company.

14      44.   When MCGOWAN learned that Amazon Studios was going to be

15  doing business with The Weinstein Company, she told Price that WEINSTEIN had

16  raped her. Price responded that it "hadn't been proven." Amazon Studios thereafter

17  refused to release MCGOWAN's script and told her that the project was "dead."

18  MCGOWAN now believes that WEINSTEIN caused Amazon Studios to purchase

19  MCGOWAN's script to see whether it contained derogatory information about him,

20  and to kill it.

14

45.   Price is not the only powerful friend whom WEINSTEIN leaned on for help in obtaining information about and harming MCGOWAN. WEINSTEIN was close with Dylan Howard, Vice President and Chief Content Officer at American Media Inc., the parent company of the *National Enquirer* and other publications. AMI had signed a production deal with WEINSTEIN in 2015. WEINSTEIN had already relied on Howard at least twice for help in suppressing derogatory information, including when WEINSTEIN caused Howard's staff to stop reporting the story of a model who alleged that WEINSTEIN groped her and when WEINSTEIN asked *National Enquirer* reporters to investigate negative stories about Ashley Judd going to rehab after she claimed that a studio head—WEINSTEIN— harassed her.

46.   In late 2016, Howard forwarded WEINSTEIN "something AMAZING": a recording from an AMI subcontractor. The subcontractor secretly recorded a conversation with MCGOWAN's ex-boyfriend Robert Rodriguez's ex-wife (whom Rodriguez left for MCGOWAN). The subcontractor enticed the ex-wife to make damaging statements about MCGOWAN, and she "laid into Rose pretty hard." WEINSTEIN replied that the recording was "the killer. Especially if my fingerprints r not on this."

47.   This was WEINSTEIN's *modus operandi*: enlisting powerful people to discredit those who could harm him by exposing his misconduct, and keeping his

15

"fingerprints" off of the illegal, coercive, harmful tactics that his operatives employed.

***LISA BLOOM and THE BLOOM FIRM join the conspiracy***

48.     In or around December 2016, with BOIES and BLACK CUBE already on board, WEINSTEIN enlisted LISA BLOOM, a well-known civil-rights attorney and a self-proclaimed women's advocate.

49.     BLOOM's mother, Gloria Allred, is a prominent civil-rights attorney who has made a name for herself by representing victims of sexual harassment and sexual assault. After first working for Allred's firm, BLOOM appeared to follow in her mother's footsteps, building her own legal practice and establishing THE BLOOM FIRM. At THE BLOOM FIRM, BLOOM primarily represented women who accused celebrities and other prominent men of sexual harassment and assault, including President Donald Trump and then-Fox News anchor Bill O'Reilly. She cultivated press attention, and was featured on *Oprah*, *Dr. Phil*, *Nightline*, *Today*, *Good Morning America*, and many other shows, even hosting her own show on Court TV. As of December 2016, BLOOM had positioned herself publicly as a victims' advocate, helping women stand strong against those who sexually harassed or assaulted them.

50.     BLOOM, however, like BOIES, saw WEINSTEIN as a business opportunity. BLOOM wanted WEINSTEIN to turn her book—*Suspicion Nation*,

about Trayvon Martin and racism in the justice system—into a mini-series. In exchange for BLOOM's help discrediting MCGOWAN, WEINSTEIN did just that. In or around March 2017, approximately three months after she secretly joined his team of fixers, WEINSTEIN optioned the rights for BLOOM's book. BLOOM tweeted in excitement, "BIG ANNOUNCEMENT: My book SUSPICION NATION is being made into a miniseries, produced by Harvey Weinstein and Jay Z!"

51.    As MCGOWAN first learned in September 2019, BLOOM—on behalf of herself and THE BLOOM FIRM—pitched her reputation-management services in a letter to WEINSTEIN in or around December 2016. The letter is publicly available, first published in a September 2019 book entitled *She Said*, by *New York Times* reporters Jodi Kantor and Megan Twohey and then widely reproduced in the media. In the letter, BLOOM did not give or receive legal advice and had not yet been retained by WEINSTEIN. BLOOM proposed in the letter that WEINSTEIN retain her to enhance his reputation and to destroy MCGOWAN's. Indeed, she outlined a detailed plan for damaging MCGOWAN, claiming that she was well-suited to advise on this topic given her extensive experience representing women who have been sexually assaulted.

52.    Based on the letter's content, MCGOWAN believes that BLOOM transmitted this letter to WEINSTEIN via email.

17

53.   As BLOOM requested, WEINSTEIN connected her with DAVID BOIES so that she and THE BLOOM FIRM could get retained to manage WEINSTEIN's reputation. Soon, WEINSTEIN, BOIES, BLOOM, their firms BOIES SCHILLER FLEXNER and THE BLOOM FIRM, and BLACK CUBE were moving at full speed to stop MCGOWAN and WEINSTEIN's other possible accusers.

54.   More specifically, BLOOM and THE BLOOM FIRM joined BOIES and BOIES SCHILLER FLEXNER in overseeing BLACK CUBE's work and receiving reports, including from WEINSTEIN, about BLACK CUBE's activities. And the efforts to smear MCGOWAN began in earnest.

**WEINSTEIN seeks to discredit MCGOWAN**

55.   On January 20, 2017, MCGOWAN traveled to Washington, D.C. to attend the Women's March, a worldwide protest intended to advocate for women's rights. After getting off the plane in D.C., MCGOWAN noticed that her wallet was missing.

56.   Early the next morning, MCGOWAN received a call from a man who identified himself as an airport police detective, and he asked her to come retrieve her wallet. MCGOWAN found the call to be suspicious.

57.   The following day, MCGOWAN received a strange message via Instagram from a user she did not know, claiming that MCGOWAN had left her

18

wallet on the plane and that the wallet contained drugs. MCGOWAN was alarmed by the message, as she did not possess drugs on the flight, this seemed to be an odd communication, and the Instagram account was deactivated shortly after MCGOWAN received the message.

58.    MCGOWAN, worried and confused, left D.C. on a bus, rather than going back to the airport.

59.    A warrant was eventually issued for MCGOWAN's arrest on drug-possession charges. She hired counsel, who argued in public court documents that WEINSTEIN may have caused drugs to be planted in MCGOWAN's wallet. The lawyer wrote, "It is now public knowledge that Weinstein employed underhanded tactics to 'silence' his victims."

60.    In or around June 2018, MCGOWAN was formally indicted. She hired criminal defense attorney Jose Baez to continue her representation. On or about January 14, 2019, on Baez's advice, MCGOWAN dropped the defense relating to WEINSTEIN and, instead, pled no contest to the drug-possession charge, meaning that she did not admit she possessed cocaine but acknowledged that the prosecutor could nevertheless move forward on a case against her.

61.    Approximately nine days later, Baez appeared as criminal-defense counsel for WEINSTEIN, to defend WEINSTEIN against criminal sexual-assault charges in New York. Given the very short time frame that elapsed between

1    MCGOWAN's no-contest plea and Baez's appearance as WEINSTEIN's criminal-

2    defense counsel in an extremely high-profile matter, MCGOWAN can only

3    conclude that WEINSTEIN—as he has done repeatedly to MCGOWAN and

4    others—exercised his influence to harm MCGOWAN, silence her, and discredit her.

5         62.    The press surrounding the drug charges against MCGOWAN

6    undermined her reputation and served, along with other negative stories about

7    MCGOWAN, to portray her as increasingly unglued, just as WEINSTEIN, BLOOM,

8    BOIES, and BLACK CUBE set out to do.

9    **The conspirators' efforts to obtain information and to pressure MCGOWAN not
10   to publish her book**

11        63.    Turning back to early 2017, MCGOWAN told her literary agents that

12   she wanted to start working with the press in order to prepare for publication of her

13   book and a subsequent media tour.

14        64.    In early January 2017, MCGOWAN's literary agent Lacy Lynch

15   connected her with Seth Freedman, whom she described to MCGOWAN as a

16   freelance journalist from London, who was allegedly working on a story about men

17   in Hollywood. MCGOWAN spoke to the journalist by phone. Freedman was in

18   England at the time, and MCGOWAN was in the United States.

19        65.    Freedman told MCGOWAN that "everything we say is off the record"

20   and said he had spoken to Miramax employees who were desperate to talk about

20

who had abused them. Freedman pressed MCGOWAN for information about her book and what she planned to say in it. He also inquired whether she was talking to other reporters.

66.    Many of Freedman's statements to MCGOWAN seemed designed to intimidate her. For example, he suggested to MCGOWAN that others might be afraid to go on the record with allegations about WEINSTEIN because "if they do say it, then they'll never work again." He also suggested that MCGOWAN would suffer if she named WEINSTEIN because someone could "come back at" her. Freedman ultimately asked MCGOWAN what would make her "call it quits," meaning refrain from going public with her allegations against WEINSTEIN.

67.    MCGOWAN did not know it at the time, but would learn much later that Freedman was being paid by BLACK CUBE to get information about MCGOWAN and her book, and that he was recording their call without MCGOWAN's consent. BLACK CUBE was likewise using Freedman to try to obtain information about other possible WEINSTEIN accusers and "unfriendly" journalists.

68.    Freedman also reached out to journalists Ronan Farrow and Ben Wallace, both of whom were then working on stories about WEINSTEIN, trying to pump them for information. In a phone call, Freedman told Farrow that he wanted to talk about a "soft piece about life in the film industry." Freedman asked Farrow

about MCGOWAN, saying that she had been very helpful on the piece. He offered to connect Farrow with a high-profile source in exchange for information about what Farrow was working on. When Farrow declined to give details of his work, Freedman warned Farrow about libel law in the UK and asked whether in the United States a reporter could publish information without proof to back it up. This call was one of a number of similar calls Freedman made per BLACK CUBE's instructions.

69.     In approximately March 2017, Lynch contacted MCGOWAN to relay that BLOOM wanted to speak with MCGOWAN about WEINSTEIN. MCGOWAN's understanding from Lynch was that BLOOM wanted an opportunity to convince MCGOWAN that WEINSTEIN had changed, and he was now a family man who wanted to make amends. BLOOM did not reveal that she was actually on retainer as WEINSTEIN's reputation manager and advising him about how to discredit MCGOWAN. MCGOWAN declined to speak with BLOOM.

70.     On or about April 4, 2017, someone using the name Diana Filip emailed Lynch, asking for Lynch to connect Filip with MCGOWAN. This email—like the others described in this Complaint—constituted an interstate wire communication.

71.     Filip said, "I am writing to you on behalf of Reuben Capital Partners, a London-based private Family Office that specialises in wealth investment and management. Our Family Office takes pride in being at the forefront of socially responsible investments." Filip stated that her company was launching "Women in

Focus," and stated, "We have taken a keen interest in the work Ms Rose McGowan does for the advocacy of women's rights, and we believe that the ideals she strives towards align closely with those upheld by our new initiative."

72.     On or about May 3, 2017, Lynch emailed MCGOWAN, copying Filip. Lynch said that Filip was available to meet MCGOWAN on May 12 in Beverly Hills, CA. On May 4, 2017, Filip emailed MCGOWAN, stating, "Rose, it's a great pleasure to connect with you. I understand that we have a lot in common and I very much look forward to meeting you in person."

73.     What MCGOWAN did not know then, and would not learn until November 2017, is that Filip was actually Stella Penn Pechanac, a former Israeli intelligence officer who worked for BLACK CUBE. Her identity and her purported business were a ruse in order to defraud and harm MCGOWAN. At all times, Pechanac (described throughout this Complaint as Filip, because that is how she presented herself to MCGOWAN) acted as BLACK CUBE's authorized agent, and likewise as WEINSTEIN's, BOIES's, BOIES SCHILLER FLEXNER's, BLOOM's, and THE BLOOM FIRM's authorized agent.

74.     Defendants' tactic in using a spy agency and sending in Filip as a women's rights activist and investor was especially coercive towards MCGOWAN. The entire Diana Filip identity was constructed to target MCGOWAN's

23

vulnerabilities, falsely to secure her trust, and to coerce MCGOWAN into sharing information about her book and about WEINSTEIN.

75.     On or about May 12, 2017, MCGOWAN and Filip met for the first time in person at the Peninsula Hotel in Beverly Hills, CA, and spoke for several hours about MCGOWAN's work and life. Filip said that she was the deputy head of sustainable and responsible investments at Reuben Capital Partners, a London-based wealth-management firm. Filip claimed to be interested in paying MCGOWAN for speaking engagements on women's rights and learning more about the projects that MCGOWAN had in development. Filip spoke with an accent, used a UK cell phone number, and offered MCGOWAN $60,000 for a speaking event related to combating discrimination against women in the workplace. MCGOWAN, relying on Filip's fraudulent representations, opened up to her and shared information about her work, including about her book.

76.     The next day, on or about May 13, 2017, MCGOWAN emailed Filip, asking, "Are you awake? Want to come over and we can have breakfast at Chateau Marmont if you'd like." MCGOWAN and Filip met at Chateau Marmont in Los Angeles, CA and spent nearly six hours together.

77.     During these two meetings, MCGOWAN read Filip excerpts of her book, which she had not shared with anyone else at that time. During the May 13 meeting, MCGOWAN had her laptop with her, and Filip pressed to read an excerpt

24

1    for herself. Again, even though MCGOWAN had not yet showed her draft to anyone

2    else, MCGOWAN—believing Filip to be someone she was not—allowed her to read

3    part of the book on MCGOWAN's laptop.

4        78.    MCGOWAN did not know at that time, and would not learn until

5    November 2017, that Filip was recording MCGOWAN throughout these meetings

6    without her consent in order to compile hours of information that were then shared

7    with WEINSTEIN, BOIES, BLOOM, and others. MCGOWAN reasonably expected

8    that all of her conversations with Filip were private. Even though they occasionally

9    spoke at restaurants, they chose locations that were empty or nearly empty. Even

10    then, they sat close by each other, sufficiently away from others so that others could

11    not hear. They also spoke in a confidential manner, such that MCGOWAN did not

12    believe or reasonably expect that anyone else would be privy to their private

13    communications.

14        79.    Ultimately, through this deceptive and fraudulent behavior, Defendants

15    succeeded in obtaining for WEINSTEIN more than a hundred pages of transcripts

16    and descriptions of *Brave*, based on hours of recorded conversations between

17    MCGOWAN and Filip.

18        80.    At the same time that Filip was defrauding MCGOWAN, she was also

19    seeking to defraud reporters working on the WEINSTEIN story, including *New York*

20    *Times* reporter Jodi Kantor and *New Yorker* writer Ronan Farrow. For example, on

or about August 8, 2017, Filip sent an email to Kantor, seeking Kantor's response and fraudulently posing—as she had to MCGOWAN—as a London-based executive who was staging a series of events devoted to advancing women in the workplace.

81. Filip's fraudulent statements and surreptitious recordings were a central part of the scheme by WEINSTEIN, BOIES, BLOOM, their firms, and BLACK CUBE to infiltrate MCGOWAN's life and interfere with her attempts, and journalists' efforts, to expose WEINSTEIN.

82. But BLACK CUBE was not targeting only MCGOWAN. BLACK CUBE compiled a list of names that also included secondary sources who corroborated MCGOWAN and other accusers' stories, as well as sources working with journalists in their investigations of WEINSTEIN. BLACK CUBE did not compile this list alone. WEINSTEIN directed associates to canvass former coworkers to see if they had heard from any reporters, specifically from Ronan Farrow, and to request copies of any emails sent to or received from Farrow. The information that WEINSTEIN's associates compiled was being sent to BLACK CUBE and its operatives for follow-up.

83. Around the same time, Ronan Farrow reached out to BLOOM to seek her advice on a "sensitive story" involving nondisclosure agreements. After BLOOM promised to keep the conversation in confidence, Farrow said that the story

involved WEINSTEIN. BLOOM did not disclose that she was on retainer as WEINSTEIN's reputation manager.

84.     Soon after, BLOOM called Farrow to inquire about the WEINSTEIN story. This time, BLOOM mentioned that she was acquainted with WEINSTEIN and BOIES and asked Farrow for specifics: had he seen any nondisclosure agreements, how many women was he talking to, who was he talking to. BLOOM offered to help Farrow if he provided specifics, and he welcomed her advice on how to insulate WEINSTEIN's accusers from liability. Again, BLOOM did not disclose that she was on retainer for WEINSTEIN and was actively working to discredit his accusers.

***WEINSTEIN and his co-conspirators increase the pressure***

85.     Throughout spring and early summer 2017, investigative reporters were compiling information about MCGOWAN, other women, and WEINSTEIN's efforts to silence them. WEINSTEIN knew that the reporters were asking questions about him, and he knew that MCGOWAN and others were speaking with them, but he was desperate to know more.

86.     Accordingly, WEINSTEIN deployed the spies hired through BOIES and BOIES SCHILLER FLEXNER to monitor the journalists and ascertain what information they had obtained. WEINSTEIN, BOIES, BLOOM, their firms, and BLACK CUBE were intent on stopping any and all public allegations of WEINSTEIN's misdeeds. BLACK CUBE agents began following Farrow, and

Kantor was warned that she was likely being watched as well. MCGOWAN and MCGOWAN's partner at the time felt that they, too, were being watched.

87.    In or around April 2017, Farrow received calls and texts from publicist Matthew Hiltzik, who reached out to Farrow on WEINSTEIN's behalf. Hiltzik told Farrow that WEINSTEIN could clear up any allegations that MCGOWAN might be making. When Farrow said that he could not talk about his investigation, Hiltzik told Farrow that WEINSTEIN was agitated and upset. According to Hiltzik, WEINSTEIN said other news outlets had investigated WEINSTEIN but determined allegations about WEINSTEIN to be unfounded. Hiltzik warned Farrow that WEINSTEIN would not be taking action immediately, but that he was going to do something. Hiltzik advised Farrow to put his investigation on the back burner.

88.    Farrow also began to get pressure from NBC, where he was then employed, to put the WEINSTEIN story on hold. Top executives at the network who had previously encouraged him to pursue the story suddenly raised concerns about airing it, directing him to pause his reporting and his interviews with sources. Later, Farrow learned that WEINSTEIN, BOIES, and attorney Charles Harder were pressuring NBC to kill the story, and were leveraging WEINSTEIN's knowledge about sexual-harassment allegations against top NBC talent Matt Lauer and WEINSTEIN's connections with Dylan Howard at the *National Enquirer* to do so.

89.     On or about April 24, 2017, WEINSTEIN met with Dylan Howard of the *National Enquirer*, a BLACK CUBE agent, and Lanny Davis. Davis was a lawyer and crisis manager who had helped Bill Clinton when Clinton faced sexual-misconduct allegations. When Davis greeted the team that morning, he told WEINSTEIN that the BLACK CUBE operative had to leave if WEINSTEIN wanted to maintain attorney-client privilege. Annoyed, WEINSTEIN told Davis that the BLACK CUBE operative did not have to leave. WEINSTEIN ranted about MCGOWAN, how she was "crazy, a liar," and said that he wanted to discredit the women making what he described as false claims about him. Davis advised him against discrediting the women even if WEINSTEIN thought he was right because of how that tactic would appear. After the meeting, BLACK CUBE's director Avi Yanus emailed BOIES SCHILLER FLEXNER attaching an invoice for a ten-week extension of BLACK CUBE's contract, to which WEINSTEIN had agreed.

90.     Approximately the first week of May 2017, a BLACK CUBE representative called WEINSTEIN to inform him that BLACK CUBE's agent had scheduled a meeting in Los Angeles, CA the following week that BLACK CUBE believed would lead to the disclosure of high-quality intelligence. This referred to the meeting that Lynch had arranged between MCGOWAN and Filip. This next phase of BLACK CUBE's work required additional payment, and on or about May 12, 2017, BOIES's son Christopher, who was also a partner at his law firm, oversaw

the interstate wiring of an additional $50,000 to BLACK CUBE. The day this payment appeared in BLACK CUBE's account was the very same day that MCGOWAN and Filip first met face-to-face in California.

91.   Around this time, WEINSTEIN also began secretly meeting with MCGOWAN's literary agents, Lacy Lynch and Jan Miller. Miller, unbeknownst to MCGOWAN, was WEINSTEIN's close friend and was working with WEINSTEIN. In or around summer 2017, WEINSTEIN, Lynch, and Miller had dinner at the Lambs Club in New York, NY, where Lynch and Miller pitched WEINSTEIN various projects. Neither Lynch nor Miller disclosed to MCGOWAN that they were dining and doing business with WEINSTEIN.

92.   On or about June 6, 2017, BLACK CUBE met with WEINSTEIN and his representatives at BOIES SCHILLER FLEXNER in New York to deliver an update. BLACK CUBE's director Yanus presented Christopher Boies with its final report and informed him that BLACK CUBE had been able to successfully achieve the project's objectives. The same day, in an email from Yanus to Christopher Boies, Yanus attached an invoice for $600,000 for a bonus that BLACK CUBE claimed it had earned, of which WEINSTEIN eventually paid $190,000.

93.   On or about June 12, 2017, Yanus emailed Christopher Boies, checking on the status of BOIES SCHILLER FLEXNER's payment to BLACK CUBE.

30

94.    On or about June 18, 2017, WEINSTEIN met with BLACK CUBE representatives in London to review the firm's findings and discuss next steps. The same day, Yanus emailed Christopher Boies to report about the meeting.

95.    In or around late June 2017, WEINSTEIN discussed with BLACK CUBE the illegality of the firm's tactics. WEINSTEIN was not worried that BLACK CUBE might be doing something illegal; he knew that already. He was concerned only that he might face personal exposure later. Despite these concerns, WEINSTEIN continued to employ BLACK CUBE to carry out his campaign against MCGOWAN, other accusers, and the journalists investigating him.

96.    In approximately early July 2017, BLOOM emailed Jodi Kantor at the *New York Times*, asking to talk. Kantor, who was working feverishly on the WEINSTEIN story, knew BLOOM's reputation and at first assumed that BLOOM had clients with allegations against WEINSTEIN and was getting in touch to help. When a *New York Times* colleague alerted Kantor to the fact that WEINSTEIN was producing a miniseries about BLOOM's *Suspicion Nation* book, Kantor proceeded with caution.

97.    On or about July 10, 2017, Filip emailed MCGOWAN, stating, "Dear Rose, I've been thinking about you and I hope everything is well!... I'm actually back in the US at the moment, and was hoping that we could get together again. I realize it's short notice, but I could come to LA this coming Wednesday, or

depending on your availability, sometime in the next two weeks." MCGOWAN responded that she was going to be in New York. Filip asked for MCGOWAN's mobile number, "just to make it easier for us to coordinate."

98.   WEINSTEIN, BOIES, and BLOOM—having listened to hours of MCGOWAN recordings, including detailed excerpts of her book—wanted more information about what MCGOWAN might expose. Moreover, they wanted to stop the investigative reporting that was in the works, which included information about MCGOWAN and other women who might expose the pattern and history of WEINSTEIN's misconduct.

99.   On or about July 11, 2017, BOIES SCHILLER FLEXNER and BLACK CUBE entered into a second contract on WEINSTEIN's behalf. This was no form agreement. It had nothing to do with litigation or anticipated litigation. It was specifically tailored to WEINSTEIN's efforts to quash MCGOWAN's book and halt publication of negative stories about WEINSTEIN. The contract specified WEINSTEIN's and BOIES SCHILLER FLEXNER's main objectives: (1) provide intelligence that will help WEINSTEIN's efforts to "completely stop the publication of a new negative article in a leading NY newspaper," and (2) "[o]btain additional content of a book which is currently being written and includes harmful negative information" about WEINSTEIN. In the contract, BLACK CUBE promised to

devote a "full-time agent by the name of 'Anna'" to the project for four months, as well as avatar operators, intelligence analysts, and others.

100.   The "book which is currently being written," referenced in the BLACK CUBE contract, was MCGOWAN's *Brave*. In the BLACK CUBE contract, BOIES SCHILLER FLEXNER promised BLACK CUBE a bonus for obtaining the actual unpublished book from MCGOWAN: "in the event in which Black Cube succeeds in achieving the other half of the Book's content (approximately 250 pages in total) in readable book and legally admissible format (and not just based on interviews or recordings but the actual Book), Black Cube will be paid, an additional success fee of USD$50,000."

101.   BOIES personally signed the contract with BLACK CUBE, despite the fact that he represented the *New York Times*, the "leading NY newspaper" referenced in the BLACK CUBE contract and one of the very outlets that BLACK CUBE was deceiving through its spies. The *Times* was so irate upon learning of BOIES's and BLACK CUBE's contract in November 2017 that it fired BOIES and his firm and issued a public statement denouncing BOIES's conduct. But in July 2017, WEINSTEIN, BOIES, BLOOM, and BLACK CUBE continued to operate in secret to steal MCGOWAN's intellectual property.

102.   BLOOM personally met with Filip during this time and discussed Filip's activities with WEINSTEIN.

33

103.   On or about July 19, 2017, MCGOWAN met with Filip at the Peninsula Hotel in New York, NY. Filip and MCGOWAN spent several hours together, and MCGOWAN had her laptop with her and a copy of her manuscript on the computer. MCGOWAN was not feeling well, and she excused herself to the restroom at several points. Although Filip had access to MCGOWAN's computer at the Peninsula Hotel, MCGOWAN did not authorize Filip to access her computer or to view or remove files from her computer. MCGOWAN now believes that Filip took this opportunity to steal MCGOWAN's property, including MCGOWAN's manuscript *Brave*.

104.   On or about July 24, 2017, Filip emailed MCGOWAN, stating, "I'm back home, and just wanted to thank you again for the wonderful evening! It's always a pleasure seeing you and spending time with you :). I sincerely hope I'll be back soon and that this time we'll have more time! I was thinking about Ronan Farrow, who you mentioned during our meeting…. Seems like a really impressive and sweet guy. I read a bit about him and was very impressed by his work, despite the problematic family connection." Filip then asked MCGOWAN if she would introduce Filip to Farrow. Filip followed up again by email on or about July 31, 2017, asking for the introduction and for another meeting with MCGOWAN.

105.   Filip contacted Farrow by email on or about July 31, 2017, requesting a meeting and suggesting that he join her campaign to end professional discrimination against women. Filip wrote, "I am very impressed with your work as

34

1    a male advocate for gender equality, and believe that you would make an invaluable

2    addition to our activities."

3        106.   Filip and BLACK CUBE continued not only to monitor MCGOWAN

4    but also to spy on the reporters, as WEINSTEIN feared what the reporters had

5    unearthed.

6        107.   On or about August 11, 2017, Filip sent MCGOWAN an email stating,

7    "I'm planning to be in NY next week, are you going to be in town?  I would love to

8    take you to dinner to catch up, and also to finalise some of the things we've left

9    open…."

10       108.   On or about August 21, 2017, MCGOWAN met with Filip for several

11   hours at the Peninsula Hotel in Beverly Hills, CA. MCGOWAN spoke to Filip

12   frankly about her intent to go public with her rape allegation against WEINSTEIN.

13       109.   On or about August 31, 2017, Filip emailed MCGOWAN, stating, "I'm

14   coming back to the US next week with one of our VP's and as we discussed during

15   our last meeting, I think it would be a good idea for you to meet him and pitch him

16   your ideas :). I think funding will not be an issue if he gets to know you and sees

17   how passionate you are about your ventures and their message. Will you be able to

18   make it next Thursday (September 7)? Same place? Let me know!" They ultimately

19   scheduled the meeting for September 22, 2017.

20

110.   On or about September 22, 2017, MCGOWAN met Filip and a man Filip introduced as a vice president of Reuben Capital Partners, Paul Laurent, at the Peninsula Hotel in Beverly Hills, CA. Filip, Laurent, and MCGOWAN spoke about possible collaborations and their shared belief in the importance of telling stories that would empower women. MCGOWAN and Filip also discussed how explicitly MCGOWAN was going to publicly describe her allegation against WEINSTEIN, and under what circumstances. They discussed what MCGOWAN had disclosed to reporters and what she was writing in her book. MCGOWAN—fully believing what Filip said at the time, not knowing that Defendants were conspiring to undermine her—told Filip that there was no one else in the world she could trust.

111.   MCGOWAN did not know at that time, and would not learn until November 2017, that Laurent was also a BLACK CUBE spy, and that Filip and Laurent were recording MCGOWAN throughout these meetings without her consent in order to compile hours of information to be then shared with WEINSTEIN, BOIES, BLOOM, and others.

112.   Around this time, in or around fall 2017, WEINSTEIN met with three BLACK CUBE operatives in New York, NY, including director Yanus and Filip. One of the operatives told WEINSTEIN, "We've got something good for you." Filip then spoke about the months she had spent gaining MCGOWAN's trust and secretly recording hours of conversations. BLACK CUBE operatives read aloud what they

1   said were passages about WEINSTEIN from MCGOWAN's not-yet-published book.

2   WEINSTEIN appeared to be upset and said, "Oh, my God. Oh, my God."

3       113.   Separately, WEINSTEIN and his co-conspirators continued their

4   campaign of intimidation and tried to bribe MCGOWAN not to release *Brave*.

5   WEINSTEIN attorney Charles Harder approached an attorney whom

6   MCGOWAN's literary agents had suggested she work with, offering MCGOWAN

7   $1 million on WEINSTEIN's behalf to drop publication of the book and to enter into

8   a non-disclosure agreement with WEINSTEIN. MCGOWAN felt increasingly

9   pressured to take the money and drop *Brave*, or risk further retaliation by

10   WEINSTEIN.

11       114.   As summer turned to fall, however, MCGOWAN had not accepted the

12   offer. In or around September 2017, WEINSTEIN and his agents discussed leaking

13   a story about MCGOWAN's drug charges—which were not then public—to the

14   media, in order to damage MCGOWAN's credibility. MCGOWAN was stunned

15   when a reporter contacted her about the allegations, and she preemptively announced

16   the charges on her own in order to blunt WEINSTEIN's planned attack.

17       115.   Around this same time, WEINSTEIN's increasing desperation led him

18   to threaten litigation against Farrow for his WEINSTEIN investigation. The attorney

19   who reached out to Farrow was Charles Harder—the same attorney trying to bribe

20   MCGOWAN to shutter her book.

116.   Through these discussions, Farrow learned that BLOOM was part of WEINSTEIN's public-relations team. When Farrow confronted BLOOM about why she had concealed her relationship with WEINSTEIN, BLOOM said that she had been in an awkward position because WEINSTEIN had optioned her book, *Suspicion Nation*. BLOOM offered to help Farrow, and make things easier for him, by talking to WEINSTEIN and BOIES on his behalf. She again asked Farrow what sources he had. BLOOM told Farrow that if he was speaking with MCGOWAN, she had looked into MCGOWAN and had files on her. BLOOM told Farrow that MCGOWAN was "crazy."

117.   Not only was BLOOM secretly working with WEINSTEIN, it turned out that she was also aiding Roy Price, the Amazon executive who bought and buried MCGOWAN's screenplay. In fall 2017, Price was facing his own sexual-misconduct allegations. A journalist investigating Price alleged that—just as BLOOM was helping WEINSTEIN do to MCGOWAN and others—BLOOM tried to kill reporting about Price by spreading false and discrediting rumors.

***The news articles are published***

118.   On or about October 5, 2017, on the eve of the *New York Times* publishing stories deeply adverse to him, WEINSTEIN and his co-conspirators tried yet again to undermine MCGOWAN and the other accusers. WEINSTEIN, BLOOM, and other WEINSTEIN representatives met in person with reporters to present a

dossier that the agents had collected on MCGOWAN and others whom WEINSTEIN and his advisers believed were talking to the press, including Ashley Judd and Ambra Battilana Gutierrez.

119.   WEINSTEIN and BLOOM presented photographs of MCGOWAN and WEINSTEIN together, discussed MCGOWAN's sexual history, and attempted to use the information gained by Defendants' conspiracy to paint MCGOWAN as mentally unstable and completely incredible. They similarly sought to discredit other WEINSTEIN victims.

120.   But their efforts were unsuccessful, and the *New York Times* and *The New Yorker* published expansive exposés regarding WEINSTEIN's misconduct and the way in which he and his agents tried to silence not only MCGOWAN but also others. The articles revealed the history of WEINSTEIN's misconduct and the complicity of those around him, and opened a floodgate of reports about WEINSTEIN and those whom he had silenced.

121.   On or about October 10, 2017, the day *The New Yorker* published Farrow's story about WEINSTEIN titled "From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories," Filip reached out to MCGOWAN in an email. "Hi Love," she wrote. "How are you feeling?... Just wanted to tell you how brave I think you are." *The New Yorker* article did not mention MCGOWAN.

122.   Filip continued to communicate with MCGOWAN by email. For example, on or about October 23, 2017, Filip wrote to MCGOWAN, copying the BLACK CUBE operative going by the name Paul Laurent. Filip wrote, "Dear Rose and Paul, Following our meeting in LA last month, it is my pleasure to connect the two of you via email so that you can discuss business and communicate directly."

123.   MCGOWAN began to discover how deeply she had been betrayed in connection with *The New Yorker*'s November 6, 2017 publication of another Farrow article, titled "Harvey Weinstein's Army of Spies." The article detailed the concerted efforts by WEINSTEIN, BOIES, BOIES SCHILLER FLEXNER, and BLACK CUBE to defraud her, use deception to steal portions of her book, and discredit and humiliate her.

124.   It was only in connection with the November 6, 2017 *New Yorker* article that MCGOWAN learned that Filip was actually a BLACK CUBE agent, working against MCGOWAN. It was only in connection with the *New Yorker* article that MCGOWAN also learned that she had been recorded without her consent and that those audio files had made their way to WEINSTEIN. It was only in connection with the *New Yorker* article that MCGOWAN learned that WEINSTEIN had tried and succeeded to steal *Brave* before its publication. MCGOWAN was horrified and disgusted to learn that one of the first people to access her book was WEINSTEIN, the very man she sought to expose as her rapist.

40

1    125.   MCGOWAN did not learn about BLOOM's role until approximately

2    September 2019, when *New York Times* journalists Megan Twohey and Jodi Kantor

3    reported about BLOOM's relationship with WEINSTEIN and her mission to harm

4    MCGOWAN.

5    **Backlash and blacklisting**

6    126.   As WEINSTEIN's façade began to crumble, and others came forward

7    with similar allegations of harassment and assault, MCGOWAN pressed on with her

8    book and her work to expose WEINSTEIN. MCGOWAN worked throughout the

9    end of 2017 to finish her book and to prepare for her tour to promote her work.

10   127.   On or about January 30, 2018, *Brave* was publicly released. The same

11   day, WEINSTEIN released a statement asserting that WEINSTEIN had two

12   witnesses disputing MCGOWAN's account of the rape. WEINSTEIN's statement

13   also provided three photos of WEINSTEIN and MCGOWAN being publicly

14   photographed together at a 2005 gala. WEINSTEIN apparently wanted the public to

15   conclude that because WEINSTEIN and MCGOWAN were photographed together

16   at an event in 2005, he could not have assaulted her when she was a 24-year-old

17   actress in 1997.

18   128.   WEINSTEIN and his co-conspirators' immediate and aggressive

19   attacks on MCGOWAN upon *Brave*'s release—following on what MCGOWAN by

20   then knew had been over a year's concerted effort to spy on her, send in false friends

1   to defraud and manipulate her, and to try to embarrass her into silence—harmed

2   MCGOWAN greatly. Although MCGOWAN had planned a book tour to promote

3   *Brave*, some odd and disturbing encounters right at the tour's beginning caused

4   MCGOWAN to be understandably concerned that WEINSTEIN was planting

5   hecklers to thwart her efforts to promote *Brave*. In addition, the recent revelations

6   concerning WEINSTEIN's campaign to spy on her, steal her book, and harm her

7   took a substantial toll on MCGOWAN's mental health and wellbeing. MCGOWAN

8   had a mental breakdown. She canceled the tour, exhausted, depleted, and afraid for

9   her safety and of what WEINSTEIN had in store for her. She sought treatment for

10   post-traumatic stress disorder and spent the better part of 2018 feeling like she would

11   not survive the trauma.

12   ***Impact on MCGOWAN***

13       129.   It would be difficult to overstate the impact that Defendants' conduct

14   has had on MCGOWAN. She hurdled substantial obstacles in her childhood, and

15   she entered adulthood with the desire and true possibility to share her talents and

16   vision worldwide. Like so many others, she fell prey to WEINSTEIN. Then, like so

17   many others, she scraped past her WEINSTEIN encounter, trying to preserve her

18   dignity and her career, yet always feeling terrified that he could destroy her at any

19   moment.

20

130.   As she evolved, MCGOWAN grew stronger. She decided to speak her truth. But WEINSTEIN returned, wielding considerable power—and that of his formidable, relentless co-conspirators—to shame, silence, and ruin MCGOWAN. In the process, he did his best to make her seem deranged and crazy. He and the other Defendants degraded her and violated her privacy. They defamed her and told the world that she was not to be believed. And they used tactics that would cause anyone to experience incredible, ongoing trust issues. For someone with MCGOWAN'S history of past trauma, the tactics caused significant emotional trauma and drove her out of Hollywood and her home.

131.   Defendants' conduct devastated MCGOWAN's career. It has caused her concrete economic losses, including interruption and termination of MCGOWAN's relationships with commercial partners; fees and costs paid to MCGOWAN's literary agents; legal fees and costs associated with the criminal drug-possession case and with WEINSTEIN's efforts to prevent *Brave*'s publication; decreased book sales;  lost employment opportunities; lost commercial opportunities including film, television, book, and other media projects; and harm to MCGOWAN's business reputation. Defendants' conduct has also severely affected MCGOWAN's mental health, relationships, and living conditions. She sold her home in Hollywood to pay fees and costs associated with recovering from the trauma

Defendants caused and has, since 2018, moved from place to place, spending increasing amounts of time abroad and away from the triggers of Hollywood.

132. The preceding factual allegations are based substantially on MCGOWAN's personal interactions and observations and credible information that has been shared with MCGOWAN by reliable sources. To the extent that the above factual allegations describe events in which MCGOWAN did not personally participate, MCGOWAN and her counsel have a good-faith belief based on extensive and reliable public reporting, including but not limited to the books *She Said* by Jodi Kantor and Megan Twohey, the book *Catch and Kill* by Ronan Farrow, and other fact-checked reporting by the *New York Times* and *The New Yorker*, that such allegations will have evidentiary support after a reasonable opportunity for discovery.

## COUNT I
### Civil RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants)

133. The allegations in paragraphs 1 through 131 are incorporated here.

134. Defendants HARVEY WEINSTEIN, DAVID BOIES, BOIES SCHILLER FLEXNER, LISA BLOOM, THE BLOOM FIRM, and BLACK CUBE, are each a "person" within the meaning of 18 U.S.C. § 1961(3).

135. Defendants were all associated with an enterprise, referred to here as the WEINSTEIN-PROTECTION ENTERPRISE. The WEINSTEIN-

44

PROTECTION ENTERPRISE consisted of HARVEY WEINSTEIN, DAVID BOIES, BOIES SCHILLER FLEXNER, LISA BLOOM, THE BLOOM FIRM, BLACK CUBE, AMI, Jose Baez, Christopher Boies, Lanny Davis, Charles Harder, Dylan Howard, Lacy Lynch, Jan Miller, Stella Penn Pechanac, Roy Price, and Avi Yanus, as well as others known and unknown. The common purpose of the WEINSTEIN-PROTECTION ENTERPRISE was to protect WEINSTEIN's reputation, prevent negative public disclosures about him, and discredit those who might accuse him of wrongdoing or expose that wrongdoing. Although new persons joined the WEINSTEIN-PROTECTION ENTERPRISE over time, it has existed and sought to accomplish its purposes since no later than the late 1990s, has continued to the present, and will continue into the future until someone stops WEINSTEIN and his enablers. It has set its sights on countless victims, including but not limited to MCGOWAN, Ashley Judd, Ambra Battilana Gutierrez, Ronan Farrow, Ben Wallace, Jodi Kantor, and Megan Twohey.

136.   The WEINSTEIN-PROTECTION ENTERPRISE's activities affected interstate commerce. For instance, it sought to influence and prohibit publications of newspaper articles, magazine articles, internet publications, and books, as well as commercial media projects, and it used multiple facilities of interstate commerce, such as wire transfers of money, telephone calls, and emails.

137.   Defendants agreed to and did conduct and participate in conducting the WEINSTEIN-PROTECTION ENTERPRISE's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding MCGOWAN and other victims and obtaining property, namely, MCGOWAN's unpublished *Brave* manuscript. The pattern of racketeering activity here is based on numerous instances of wire fraud, in violation of 18 U.S.C. § 1343.

138.   Specifically, Defendants engaged in a scheme to defraud MCGOWAN, obtain MCGOWAN's property, and to defraud others who WEINSTEIN believed might accuse him of wrongdoing and who were investigating him. The acts in furtherance of the fraud scheme include those set forth in paragraphs 17 through 131.

139. Each Defendant intended to defraud MCGOWAN, obtain MCGOWAN's property, and to defraud the scheme's other victims, knowing and intending that: (a) BLACK CUBE agents would make and did make false representations to MCGOWAN in an effort to gain access to her and her computer, steal her property, intimidate her, and deceive her; and (b) BLACK CUBE agents would and did make false representations to other accusers and to journalists investigating WEINSTEIN in an effort to obtain information about their reporting, misdirect their reporting, and intimidate them.

46

140. Each Defendant actively participated in the wire-fraud scheme. Although the scheme and each Defendant's role is more comprehensively described above, in summary:

a.     WEINSTEIN recruited each Defendant to participate in the scheme, defined the scheme's objectives, participated in meetings and discussions relating to the scheme, paid money to ensure that the scheme was executed, and approved his co-conspirators' actions;

b.     BOIES and BOIES SCHILLER FLEXNER hired BLACK CUBE to provide operatives to carry out the scheme, paid BLACK CUBE for its services, attempted to shield BLACK CUBE'S activities from public disclosure, engaged BLOOM and THE BLOOM FIRM to participate in the scheme, provided strategic non-legal advice concerning the scheme, and sought to intimidate and silence the scheme's victims and publishers of the victims' accounts;

c.     BLOOM and THE BLOOM FIRM provided specialized insight and non-legal advice about how to discredit sexual-assault victims, attempted to obtain access to MCGOWAN via false and deceitful representations, oversaw and guided BLACK CUBE's work to gain information about MCGOWAN and others, and solicited information from journalist Ronan Farrow while concealing BLOOM's representation of WEINSTEIN; and

47

d.    BLACK CUBE provided agents to spy on MCGOWAN, other possible WEINSTEIN accusers, and journalists investigating WEINSTEIN, and used false personas to deceive MCGOWAN and others into providing confidential information crucial to the scheme.

141.   It was reasonably foreseeable to all Defendants that wires would be used, and were actually used, to further the scheme, including the following:

a.    Approximately October 28, 2016 interstate wire transfer of approximately $100,000 from BOIES SCHILLER FLEXNER to BLACK CUBE (¶ 40);

b.    Approximately late 2016 email from Dylan Howard to WEINSTEIN containing audio recording of MCGOWAN (¶ 46);

c.    Approximately December 2016 letter from BLOOM to WEINSTEIN, believed to be transmitted from BLOOM to WEINSTEIN by email (¶¶ 51-52);

d.    Approximately January 21, 2017 Instagram message from unknown user to MCGOWAN regarding MCGOWAN's wallet (¶ 57);

e.    Approximately January 2017 telephone call between Freedman and MCGOWAN (¶¶ 64-67);

f.    Approximately early 2017 telephone call between Freedman and Farrow (¶ 68);

g.      Approximately March 2017 telephone call between Lynch and MCGOWAN regarding BLOOM's interest in speaking with MCGOWAN (¶ 69);

h.      Approximately April 4, 2017 Filip email to Lynch, requesting to meet MCGOWAN (¶¶ 70-71);

i.      Approximately April 24, 2017 email from Avi Yanus to BOIES SCHILLER FLEXNER attaching invoice for extension of BLACK CUBE's contract (¶ 89);

j.      Approximately May 3, 2017 Lynch email to MCGOWAN, scheduling meeting for Filip and MCGOWAN (¶ 72);

k.      Approximately May 4, 2017 Filip email to MCGOWAN regarding meeting (¶ 72);

l.      Approximately May 12, 2017 interstate wire transfer of approximately $50,000 from BOIES SCHILLER FLEXNER to BLACK CUBE (¶ 90);

m.      Approximately June 6, 2017 email from Avi Yanus to Christopher Boies attaching $600,000 invoice (¶ 92);

n.      Approximately July 10, 2017 email from Filip to MCGOWAN (¶ 97);

o.      Approximately June 12, 2017 email from Avi Yanus to Christopher Boies re BLACK CUBE payment (¶ 93);

49

p.    Approximately June 18, 2017 email from Avi Yanus to Christopher Boies re next steps (¶ 94);

q.    Approximately July 24, 2017 email from Filip to MCGOWAN (¶ 104);

r.    Approximately July 31, 2017 email from Filip to MCGOWAN (¶ 104);

s.    Approximately July 31, 2017 email from Filip to Farrow (¶ 105);

t.    Approximately August 8, 2017 Filip email to Jodi Kantor (¶ 80);

u.    Approximately August 11, 2017 Filip email to MCGOWAN (¶ 107);

v.    Approximately August 31, 2017 Filip email to MCGOWAN (¶ 109);

w.    Approximately October 10, 2017 Filip email to MCGOWAN (¶ 121);

x.    Approximately October 23, 2017 Filip email to MCGOWAN (¶ 122).

142.    The acts described above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

143.    Just as the WEINSTEIN-PROTECTION ENTERPRISE's activities affected interstate commerce, these predicate acts of racketeering likewise affected interstate commerce.

144.    Defendants directly and indirectly conducted and participated in the conduct of the WEINSTEIN-PROTECTION ENTERPRISE's affairs through this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

145.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), MCGOWAN—a "person" within the

meaning of 18 U.S.C. § 1961(3)—has been injured in her business and property, suffering concrete financial losses, including but not limited to: interruption and termination of MCGOWAN's relationships with commercial partners (including, for example, the interruption of MCGOWAN's book tour and resulting interference with her relationships with her publisher and the many retailers involved in the book tour); fees and costs paid to MCGOWAN's literary agents; legal fees and costs associated with the criminal drug-possession case and with WEINSTEIN's efforts to prevent *Brave*'s publication; decreased book sales; lost employment opportunities; lost commercial opportunities including film, television, book, and other media projects; and harm to MCGOWAN's business reputation.

## COUNT II
### Civil RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

146. The allegations in paragraphs 1 through 131 and 133 through 143 are incorporated here.

147. As set forth in Count I, Defendants intentionally agreed to conduct and participate in the conduct of the affairs of the WEINSTEIN-PROTECTION ENTERPRISE through a pattern of racketeering activity. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct

constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

148.   As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), MCGOWAN has been injured in her business and property, suffering concrete financial losses, including but not limited to: interruption and termination of MCGOWAN's relationships with commercial partners (including, for example, the interruption of MCGOWAN's book tour and resulting interference with her relationships with her publisher and the many retailers involved in the book tour); fees and costs paid to MCGOWAN's literary agents; legal fees and costs associated with the criminal drug-possession case and with WEINSTEIN's efforts to prevent *Brave*'s publication; decreased book sales; lost employment opportunities; lost commercial opportunities including film, television, book, and other media projects; and harm to MCGOWAN's business reputation.

**COUNT III**
**Federal Wiretap Act, 18 U.S.C. § 2520**
**(Against All Defendants)**

149.   Paragraphs 1 through 131 are incorporated here.

150.   In violation of 18 U.S.C. § 2511(a), Defendants intentionally intercepted, endeavored to intercept, or procured other persons to intercept oral communications of MCGOWAN, including during meetings with BLACK CUBE

agents Filip and Laurent, and during the telephone call between Freedman and MCGOWAN.

151.   In violation of 18 U.S.C. §§ 2511(c) and (d), Defendants intentionally disclosed and used, or endeavored to disclose and use, the intercepted oral communications of MCGOWAN, knowing or having reason to know that the information was obtained through the interception of protected oral communications.

152.   MCGOWAN reasonably expected and exhibited an expectation that her oral communications would not be subject to interception. MCGOWAN's expectation was justified under the circumstances.

153.   MCGOWAN did not consent to the recording of her oral communications by Defendants or their agents.

154.   By surreptitiously intercepting MCGOWAN's oral communications, Defendants acted with the purpose and intent of committing criminal and tortious acts, including the acts described in other counts of this Complaint.

155.   MCGOWAN was damaged by Defendants' violations and seeks remedies under 18 U.S.C. § 2520.

## COUNT IV
### Fraudulent Deceit, Cal. Civ. Code § 1709
### (Against All Defendants)

156.   Paragraphs 1 through 131 are incorporated here.

157.   All Defendants willfully deceived MCGOWAN, intending to harm her and doing so.

158.   Defendants HARVEY WEINSTEIN, DAVID BOIES, BOIES SCHILLER FLEXNER, LISA BLOOM, THE BLOOM FIRM, and BLACK CUBE made and caused to be made false representations to MCGOWAN, including that:

a.   BLACK CUBE's agents Filip and Laurent were Reuben Capital Partners representatives, seeking to partner with MCGOWAN on women's rights issues. Defendants also concealed that the agents were recording their conversations with MCGOWAN and that the true intent of the BLACK CUBE agents was not, in fact, to help MCGOWAN promote women's rights, but instead was to obtain information about MCGOWAN and her book and "put a stop to" any plan by MCGOWAN to reveal negative information about WEINSTEIN.

b.   Seth Freedman was a freelance journalist working on a story about men in Hollywood, when in fact—although Freedman had at one time been a legitimate journalist—he was acting at the time as a paid BLACK CUBE representative seeking to obtain information about MCGOWAN and her book and find out what it would take to silence MCGOWAN.

c.   (as to HARVEY WEINSTEIN only) Amazon Studios earnestly wished to produce MCGOWAN's script, when in fact MCGOWAN believes that WEINSTEIN facilitated Roy Price's outreach to MCGOWAN and caused Price to

1    misrepresent Amazon Studios' true interest, when WEINSTEIN's true purpose was

2    for an ally to gain control over the script and make sure it was never produced, thus

3    harming MCGOWAN's career and causing economic loss.

4        d.    LISA BLOOM wished to help MCGOWAN and speak with her about

5    how WEINSTEIN was now a changed man. BLOOM concealed that she had a

6    financial relationship with WEINSTEN and was his reputation-management advisor,

7    with the objective of discrediting and silencing MCGOWAN.

8        159.    In addition, MCGOWAN believes that WEINSTEIN concealed

9    and failed to disclose that he sought to hire MCGOWAN's criminal-defense counsel,

10   Baez, as his own counsel at a time when Baez was representing MCGOWAN in the

11   drug-possession case, as a means to exert influence on MCGOWAN's actions in the

12   drug-possession case and harm her reputation.

13       160.    Defendants knew that these representations were false when they made

14   them and caused them to be made.

15       161.    Defendants made these false representations, and caused them to be

16   made, to induce MCGOWAN's reliance on them. The purpose was to gain

17   MCGOWAN's trust and then to take advantage of that trust, and to steal her

18   unpublished manuscript, *Brave*.

19       162.    MCGOWAN justifiably relied on the representations that Defendants

20   made and caused to be made. Although she knew not to trust WEINSTEIN, she did

not know—and had no reason to know—that he employed spies to act for him and deceive her.

163.   Even if BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM did not have specific knowledge of every act that WEINSTEIN, BLACK CUBE, and their agents committed, they are vicariously liable for the intentional torts of the agents they hired and relied upon.

164.   MCGOWAN's reliance on Defendants' false representations harmed her greatly. By trusting Defendants' agents, MCGOWAN ended up revealing sensitive information that prepared Defendants to discredit and malign her publicly, undermining her book, commercial projects, and reputation, causing her damages.

**COUNT V**
**Common Law Fraud**
**(Against All Defendants)**

165.   Paragraphs 1 through 131 are incorporated here.

166.   All Defendants willfully deceived MCGOWAN, intending to harm her and doing so.

167.   Defendants HARVEY WEINSTEIN, DAVID BOIES, BOIES SCHILLER FLEXNER, LISA BLOOM, THE BLOOM FIRM, and BLACK CUBE made and caused to be made false representations to MCGOWAN, including that:

a.     BLACK CUBE's agents Filip and Laurent were Reuben Capital Partners representatives, seeking to partner with MCGOWAN on women's rights

56

1   issues. Defendants also concealed that the agents were recording their conversations

2   with MCGOWAN and that the true intent of the BLACK CUBE agents was not, in

3   fact, to help MCGOWAN promote women's rights, but instead was to obtain

4   information about MCGOWAN and her book and "put a stop to" any plan by

5   MCGOWAN to reveal negative information about WEINSTEIN.

6        b.    Seth Freedman was a freelance journalist working on a story about men

7   in Hollywood, when in fact—although Freedman had at one time been a legitimate

8   journalist—he was acting at the time as a paid BLACK CUBE representative seeking

9   to obtain information about MCGOWAN and her book and find out what it would

10   take to silence MCGOWAN.

11        c.    (as to HARVEY WEINSTEIN only) Amazon Studios earnestly wished

12   to produce MCGOWAN's script, when in fact WEINSTEIN facilitated Roy Price's

13   outreach to MCGOWAN and caused Price to misrepresent Amazon Studios' true

14   interest, when WEINSTEIN's true purpose was for an ally to gain control over the

15   script, learn its contents, and prevent it from seeing the light of day.

16        d.    LISA BLOOM wished to help MCGOWAN and speak with her about

17   how WEINSTEIN was now a changed man. BLOOM concealed that she had a

18   financial relationship with WEINSTEN and was his reputation-management advisor,

19   with the objective of discrediting and silencing MCGOWAN.

20

57

168.   In addition, MCGOWAN believes that WEINSTEIN concealed and failed to disclose that he sought to hire MCGOWAN's criminal-defense counsel, Baez, as his own counsel at a time when Baez was representing MCGOWAN in the drug-possession case, as a means to exert influence on MCGOWAN's actions in the drug-possession case and harm her reputation.

169.   Defendants knew that these representations were false when they made them and caused them to be made.

170.   Defendants made these false representations, and caused them to be made, to induce MCGOWAN's reliance on them. The purpose was to gain MCGOWAN's trust and then to take advantage of that trust, and to steal her unpublished manuscript, *Brave*.

171.   MCGOWAN justifiably relied on the false representations that Defendants made and caused to be made. Although she knew not to trust WEINSTEIN, she did not know—and had no reason to know—that he employed spies to act for him and deceive her.

172.   Even if BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM did not have specific knowledge of every act that WEINSTEIN, BLACK CUBE, and their agents committed, they are vicariously liable for the intentional torts of the agents they hired and relied upon.

173. MCGOWAN's reliance on Defendants' representations harmed her greatly. By trusting Defendants' agents, MCGOWAN ended up revealing sensitive information that prepared Defendants to discredit and malign her publicly, undermining her book, commercial projects, and reputation, causing her damages.

## COUNT VI
### Bane Act, Cal. Civ. Code § 52.1
### (Against All Defendants)

174. Paragraphs 1 through 131 are incorporated here.

175. Defendants HARVEY WEINSTEIN, DAVID BOIES, BOIES SCHILLER FLEXNER, LISA BLOOM, THE BLOOM FIRM, and BLACK CUBE intentionally interfered with and attempted to interfere with MCGOWAN's exercise and enjoyment of rights secured by the Constitution and laws of California and the laws of the United States.

176. MCGOWAN's rights that Defendants intentionally interfered with and attempted to interfere with included:

a. Privacy, a right guaranteed under Article 1, section 1 of the California Constitution, and including both informational privacy and autonomy privacy within the meaning of *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1 (1994).

b. Not to be recorded without her consent, a right guaranteed under Cal. Penal Code § 632.7.

c.     Not to be recorded where, as here, such communication was intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State, a right guaranteed under 18 U.S.C. § 2511.

177.   Defendants intentionally interfered with and attempted to interfere with these rights by improper means, namely, through fraud, coercion, and intimidation.

178.   Defendants' use of fraud, coercion, and intimidation is described in more detail in paragraphs 17 to 131. By way of summary, the tactics included enlisting and relying on BLACK CUBE agents to assume false identities (Filip and Laurent), to use false pretenses (Freedman), and to lie to MCGOWAN about their motives, in order to gain MCGOWAN's trust, record her, extract information her, and obtain her unpublished book; enlisting and relying on BLACK CUBE agents to follow and surveil MCGOWAN and her partner; enlisting and relying on Howard and AMI to obtain nonconsensual recordings of MCGOWAN and information about her; BLOOM's false and deceptive approach to MCGOWAN through Lynch; WEINSTEIN's corruption of people who were supposed to be representing MCGOWAN, such as Lynch, Miller, and Baez, to coerce MCGOWAN to act against her own interests; releasing information about the criminal charges against MCGOWAN in order to discredit her and put pressure on her; WEINSTEIN's effort through representatives to bribe MCGOWAN not to release *Brave*; labeling

MCGOWAN as "crazy" to reporters who were investigating WEINSTEIN; and launching a smear campaign about MCGOWAN when she did release *Brave*.

179.   Even if BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM did not have specific knowledge of every act that WEINSTEIN, BLACK CUBE, and their agents committed, they are vicariously liable for the intentional torts of the agents they hired and relied upon.

180.   Defendants' violations harmed MCGOWAN, causing her damages under Cal. Civ. Code § 52.

**COUNT VII**
**Invasion of Privacy**
**(Against BLOOM and THE BLOOM FIRM)**

181.   Paragraphs 1 through 131 are incorporated here.

182.   MCGOWAN had a right of privacy, protected by Article 1, section 1 of the California Constitution. Her right included: (a) informational privacy, meaning an interest in precluding the dissemination or misuse of sensitive and confidential information, and (b) autonomy privacy, meaning an interest in making intimate personal decisions or conducting personal activities without intrusion, observation, or interference.

183.   MCGOWAN reasonably expected to maintain the privacy and confidentiality of her manuscript, *Brave*, before it was published. MCGOWAN restricted access to the manuscript and—before Filip persuaded her, through lies,

61

1  that Reuben Capital Partners was interested in promoting MCGOWAN and funding

2  her projects—had not shown it to others.

3      184.   During the time period at issue in this Complaint, MCGOWAN was in

4  the process of making difficult decisions about going public with information about

5  WEINSTEIN's sexual assault.

6      185.   MCGOWAN reasonably expected to keep her *Brave* manuscript

7  private and not to disclose it to others. In particular, she reasonably expected to keep

8  her manuscript private from WEINSTEIN, the person she *least* wanted to have

9  access to her book before its publication.

10     186.   MCGOWAN reasonably expected that she was having private

11  conversations with Filip and Laurent, the BLACK CUBE agents, and that they were

12  neither recording her nor serving as WEINSTEIN's agents. She likewise reasonably

13  expected that BLOOM—a licensed attorney—would not use deception to try to gain

14  access to her to impact her decision-making about publishing her book and speaking

15  out about WEINSTEIN.

16     187.   Harvey Weinstein, David Boies, Boies Schiller Flexner LLP, Black

17  Cube, BLOOM, and THE BLOOM FIRM participated in and supervised an

18  unreasonably obtrusive investigation of MCGOWAN that violated her informational

19  privacy and her autonomy privacy. The investigation used sharp and illegal tactics

20  like stalking MCGOWAN, illegally recording her, illegally downloading

1    information from her computer, using operatives with fake identities to deceive her,

2    and lying to her about BLOOM's motives and concealing BLOOM's representation

3    of WEINSTEIN.

4        188.   Harvey Weinstein, David Boies, Boies Schiller Flexner LLP, Black

5    Cube, BLOOM, and THE BLOOM FIRM's conduct constituted a serious invasion

6    of MCGOWAN's privacy, causing her damages.

7                                 **COUNT VIII**
                    **Computer Crimes, Cal. Civ. Code § 502(e)(1)**
8                            **(Against All Defendants)**

9        189.   Paragraphs 1 through 131 are incorporated here.

10       190.   A key objective of the BLACK CUBE engagement was to obtain as

11   much as possible of MCGOWAN's book, *Brave*.

12       191.   MCGOWAN was writing the book on her laptop computer, which she

13   owned.

14       192.   Defendants HARVEY WEINSTEIN, DAVID BOIES, BOIES

15   SCHILLER FLEXNER, LISA BLOOM, THE BLOOM FIRM, and BLACK CUBE

16   devised a strategy to obtain access to MCGOWAN's book by using BLACK CUBE

17   agents to lie to MCGOWAN, gain her trust, and cause her to believe that Filip was

18   a women's rights advocate who would help MCGOWAN promote her book and the

19   women's rights issues that MCGOWAN discussed in the book. This was a scheme

20   or artifice to defraud and deceive, within the meaning of Cal. Civ. Code § 502(c)(1).

193.   Through multiple meetings with MCGOWAN, including in California, Filip sought to gain access to MCGOWAN's draft book as part of the scheme to defraud and deceive.

194.   In particular, as described further above, on or about May 13, 2017 in Los Angeles, CA, Filip reviewed excerpts of the book on MCGOWAN's computer. Although Filip had MCGOWAN's permission during that instance to hold and look at information on MCGOWAN's computer, Filip procured that permission through fraud and as part of the overall scheme to defraud and deceive MCGOWAN.

195.   Later, in approximately July 2017, as part of the same scheme to defraud and deceive, MCGOWAN believes that Defendants—via Filip—knowingly accessed MCGOWAN's computer again, without permission, wrongfully to take information from the computer, including portions of MCGOWAN's unpublished book.

196.   Even if BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM did not have specific knowledge of every act that WEINSTEIN, BLACK CUBE, and their agents committed, they are vicariously liable for the intentional torts of the agents they hired and relied upon.

197.   Defendants' conduct caused a loss to MCGOWAN, because it enabled them to obtain sensitive, non-public information that prepared Defendants to

64

discredit and malign MCGOWAN publicly, undermining her book, commercial projects, and reputation.

## COUNT IX
## Conversion
## (Against All Defendants)

198.   Paragraphs 1 through 131 are incorporated here.

199.   MCGOWAN owned and had a right to possession of her *Brave* manuscript, while she was writing the book and it was confidential and not yet published.

200.   Defendants wrongfully planned to and did implement a scheme to obtain as much of *Brave* as possible before the book was published, causing interference with MCGOWAN's possession of the confidential manuscript.

201.   Defendants' conduct caused a loss to MCGOWAN, because it enabled them to obtain sensitive, non-public information that prepared Defendants to discredit and malign MCGOWAN publicly, undermining her book, commercial projects, and reputation.

## COUNT X
## Intentional Infliction of Emotional Distress
## (Against All Defendants)

202.   Paragraphs 1 through 131 are incorporated here.

203.   Defendants intentionally engaged in extreme and outrageous conduct toward MCGOWAN.

65

204.  Defendants psychologically manipulated MCGOWAN to their advantage, lying to her, causing her to be lied to, seeking to gain and abuse her trust—all for the purpose of helping conceal that WEINSTEIN raped her when he was a powerful Hollywood producer and she was an aspiring young actress.

205.  WEINSTEIN had a clear vendetta against MCGOWAN, ranting about her to his team and paying hundreds of thousands of dollars to lawyers, investigators, and spies to make her appear unreliable and crazy. Behind the scenes he caused her projects to be scuttled and used his relationships and leverage to push her to the margins.

206.  BOIES, BLOOM, and BLACK CUBE knew that MCGOWAN had accused WEINSTEIN of sexual assault and that she was particularly vulnerable to emotional distress. Indeed, they were privy to dossiers that WEINSTEIN had caused to be compiled about MCGOWAN and knew that she had experienced many difficulties in her life.

207.  BOIES, BLOOM, and BLACK CUBE also knew that other women had accused WEINSTEIN of sexual assault and other misconduct, WEINSTEIN had faced a criminal sexual-assault investigation, and he had settled previous claims dating back to the 1990s. BOIES and BLOOM joined WEINSTEIN's team not as lawyers, to provide legal advice, but as fixers—to keep negative information about WEINSTEIN from becoming public and, plain and simple, to hurt MCGOWAN.

66

They blessed and facilitated WEINSTEIN's plan to hire spies to follow, lie to, manipulate, and record MCGOWAN, and to obtain her unpublished manuscript, and they maligned her to reporters who were on WEINSTEIN's trail in an effort to discredit her.

208.   BLOOM—trading on her credentials as a supporter of sexual-assault victims—tried to put on a friendly face toward MCGOWAN, as a supposed ally, when really the approach was part of BLOOM's explicit plan to find out what MCGOWAN wanted and silence her.

209.   Defendants acted in ways that obviously would shatter a person's trust in others. For the past few years, everywhere MCGOWAN turned, there was someone planted by Defendants who was lying to her and plotting to hurt her. Even in a time of extreme need—when MCGOWAN was facing a criminal charge that she believed WEINSTEIN had arranged—WEINSTEIN managed to worm his way in with MCGOWAN's criminal-defense counsel, causing MCGOWAN to enter a no-contest plea on that lawyer's advice and abandon her WEINSTEIN-related defense, only to find that her lawyer had shifted to WEINSTEIN's team. Truly, Defendants' conduct was beyond all possible bounds of decency and ethical conduct.

210.   Defendants intended to cause MCGOWAN emotional distress. At the very least, they acted with reckless disregard for the probability that their conduct would cause her emotional distress.

211.   Even if BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM did not have specific knowledge of every act that WEINSTEIN, BLACK CUBE, and their agents committed, they are vicariously liable for the intentional torts of the agents they hired and relied upon.

212.   MCGOWAN has endured extreme emotional distress as a result of Defendants' conduct. Since publicly tweeting about her book plans in October 2016, and over the years since then until the present, MCGOWAN has experienced suffering, nervousness, anxiety, worry, humiliation, shame, and depression. She has also been treated for symptoms of post-traumatic stress disorder.

213.   Defendants actually caused MCGOWAN's emotional distress and were the proximate cause of such emotional distress.

## COUNT XI
### Negligent Hiring and Supervision
### (Against DAVID BOIES, BOIES SCHILLER FLEXNER, LISA BLOOM, and THE BLOOM FIRM)

214.   Paragraphs 1 through 131 are incorporated here.

215.   BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM had a duty to behave ethically and not to hire or rely upon agents to accomplish their clients' objectives through unlawful or unethical means.

216.   In addition, BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM had a duty properly to supervise and monitor the activities of

68

agents hired and used by their firms to ensure that no illegal or unethical conduct took place.

217.   BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM breached that duty, causing harm to MCGOWAN.

218.   Specifically, DAVID BOIES and BOIES SCHILLER FLEXNER entered into contracts with BLACK CUBE, on WEINSTEIN's behalf.

219.   BOIES and BOIES SCHILLER FLEXNER knew and reasonably foresaw that BLACK CUBE would use illegal and unethical tactics to accomplish the engagement. The firm had worked with BLACK CUBE before on other matters, and BLACK CUBE was widely known to use former intelligence operatives who would use illicit tools to achieve nefarious objectives.

220.   Moreover, the contracts—on their faces—suggested use of questionable tactics (including, for example, obtaining recordings), called for the procurement of confidential intellectual property, and required payment of extraordinarily high fees and bonuses for obtaining confidential property that should have caused BOIES and BOIES SCHILLER FLEXNER to exercise caution.

221.   BOIES, BLOOM, and their firms supervised BLACK CUBE's activities after the contracts were entered into, including by participating in discussions with BLACK CUBE personnel and speaking with WEINSTEIN about BLACK CUBE's activities and results.

222.   Even the most basic update about BLACK CUBE's activities would have included the information that BLACK CUBE was using a female agent who assumed a fraudulent identity for the purpose of extracting information from MCGOWAN and was illegally recording discussions with MCGOWAN.

223.   Moreover, BOIES, BLOOM, and their firms are among the most sophisticated lawyers practicing in the United States. They could and did appreciate the risks associated with employing and relying on BLACK CUBE, the stated objectives of which were to kill news stories and compile dossiers on women accusing WEINSTEIN of sexual misconduct.

224.   At the very least, BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM were negligent in their supervision of BLACK CUBE and its agents, failing to determine and consistently control what tactics BLACK CUBE would use, failing to flag that the tactics were unlawful, and failing to foresee the deep harm that the illegal conduct would cause to MCGOWAN.

225.   These Defendants' actions were critical in causing the harm to MCGOWAN. WEINSTEIN was very powerful, but he could not and did not act on his own. He relied on representatives like BOIES, BOIES SCHILLER FLEXNER, BLOOM, and THE BLOOM FIRM to carry out key strategies to protect him. These Defendants' actions in hiring BLACK CUBE, supervising BLACK CUBE's work, paying BLACK CUBE's bills, and allowing BLACK CUBE's work to continue

when they knew or should have known what BLACK CUBE was doing enabled BLACK CUBE to act and continue acting wrongfully toward MCGOWAN for almost a year.

WHEREFORE, Plaintiff ROSE MCGOWAN requests judgment in her favor and against Defendants as follows:

a.  Compensatory damages in an amount to be determined at trial;

b.  Treble damages;

c.  Punitive damages;

d.  Attorneys' fees, costs, and expenses;

e.  Pre-judgment and post-judgment interest;

f.  An order enjoining Defendants from further misconduct toward MCGOWAN; and

g.  To grant further relief as this Court should find just and proper.

### DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, ROSE MCGOWAN, by and through her attorneys, Salvatore Prescott & Porter, PLLC, and hereby demands a jury trial in this matter.

Dated: October 23, 2019          By:     <u>s/ Julie B. Porter</u>
                                         JULIE B. PORTER (*pro hac vice*
                                         admission pending)
                                         Salvatore Prescott & Porter, PLLC
                                         1010 Davis Street
                                         Evanston, IL 60201
                                         P: (312) 283-5711
                                         F: (312) 724-8353
                                         porter@spplawyers.com

                                         <u>s/ Sarah S. Prescott</u>
                                         JENNIFER B. SALVATORE (*pro
                                         hac vice* admission pending)
                                         SARAH S. PRESCOTT (CA Bar No.
                                         231753)
                                         Salvatore Prescott & Porter, PLLC
                                         105 E. Main St.
                                         Northville, MI 48167
                                         P: (248) 679-8711
                                         F. (248) 773-7280
                                         salvatore@spplawyers.com
                                         prescott@spplawyers.com

                                         JENNIFER L. WILLIAMS (CA Bar
                                         No. 268782)
                                         ANYA GOLDSTEIN (CA Bar No.
                                         299780)
                                         Summa LLP
                                         800 Wilshire Blvd., Suite 1050
                                         Los Angeles, CA 90017
                                         P: (213) 260-9456
                                         F: (213) 835-0939
                                         jenn@summaLLP.com

                                         *Attorneys for Plaintiff*

72