Julie B. Porter (*pro hac vice*)
porter@sppplaw.com
Jennifer B. Salvatore (*pro hac vice*)
salvatore@sppplaw.com
Sarah S. Prescott (CA Bar No. 231753)
prescott@sppplaw.com
Andrew C. Porter (*pro hac vice*)
aporter@sppplaw.com

SALVATORE PRESCOTT PORTER &
PORTER, PLLC
1010 Davis Street
Evanston, IL 60201
Telephone:  312-283-5711
Fax:  312-724-8353

Attorneys for Plaintiff
ROSE MCGOWAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ROSE MCGOWAN,<br><br>                  Plaintiff,<br><br>     vs.<br><br>HARVEY WEINSTEIN, *et al.*,<br><br>                  Defendants. | Case No. 2:19-cv-9105-ODW (JPRx)<br><br>**PLAINTIFF ROSE MCGOWAN'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Date:  June 14, 2021<br>Time: 1:30 p.m.<br>Place: Courtroom SD<br><br>Complaint filed: October 23, 2019<br>Trial Date: Not set |

1
2                          **TABLE OF CONTENTS**
3
INDEX OF AUTHORITIES .................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...........................1

I.   BACKGROUND...................................................................1

     A.   Procedural History .........................................................1

     B.   McGowan's FAC ............................................................2

II.  ARGUMENT .......................................................................3

     A.   McGowan's RICO claims stand: ..................................3

     B.   McGowan's RICO conspiracy claim stands.............24

     C.   McGowan sufficiently pled her Computer Data
          Access and Fraud Act claim. ......................................24

     D.   McGowan's Intentional Infliction of Emotional
          Distress ("IIED") claim is colorable..........................33

     E.   McGowan's negligent hiring and supervision claim
          against the Boies and Bloom Defendants is
          sufficiently pled. .........................................................40

     F.   McGowan properly pled her invasion-of-privacy
          claim against the Bloom Defendants. ........................45

     G.   The Bloom Defendants are vicariously liable through
          agency liability............................................................46

III. CONCLUSION ..................................................................49

1

# INDEX OF AUTHORITIES

2  *Alejandre v. Gen. Elec. Co.*, No. CV 12-1304-CBM-JEM,

3      2013 WL 12119718 (C.D. Cal. Feb. 20, 2013)..............................................46

4  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir.1995)........................................5

5  *Apr. Enterprises, Inc. v. KTTV*, 195 Cal. Rptr. 421 (Cal. Ct. App. 1983) .........35-36

6  *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993) ........................................22

7  *Bell Atlantic Corp. v. Twombly*, 550 U.S 544 (2007)..............................38

8  *Berg v. First State Ins. Co.*, 915 F.2d 460 (9th Cir. 1990) .....................16

9  *Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*,

10      832 F. Supp. 585 (E.D.N.Y. 1993).................................................22

11  *Bundren v. Superior Court of Ventura Co.*,

12      145 Cal.App.3d 784 Cal.Rptr. 671 (1983) ....................................39

13  *Burger v. Kuimelis*, 325 F. Supp. 2d 1026 (N.D. Cal. 2004) ..................14

14  *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,

15      818 F.2d 1466 (9th Cir. 1987).....................................................4-5

16  *Camarillo v. City of Maywood*, No. CV 07-3469 ODW (SHX),

17      2008 WL 4056994 (C.D. Cal. Aug. 27, 2008)..............................16

18  *Capitol Audio Access, Inc. v. Umemoto*,

19      980 F. Supp. 2d 1154 (E.D. Cal. 2013)......................................32-33

20  *Cf. Armstrong v. Shirvell*, 596 F. App'x 433 (6th Cir. 2015)..................39

21  *Cf. Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 981 P.2d 79 (Cal. 1999)..................35

22  *Chaset v. Fleer/Skybox Int'l, LP,* 300 F.3d 1083 (9th Cir. 2002) .....................14-15

23  *Concha v. London*, 62 F.3d 1493 (9th Cir. 1995)......................................24

24  *COR Sec. Holdings Inc v. Banc of California, N.A.*, No. SACV171403DOCJCGX,

25      2018 WL 4860032 (C.D. Cal. Feb. 12, 2018)..............................29

26  *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094 (2009).....................43, 47

27  *Craigslist, Inc. v. Mesiab,* No. C 08-05064 CW (MEJ),

28      2009 WL 10710286 (N.D. Cal. Sept. 14, 2009) ..........................31

1   *Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276 (Ind. Ct. App. 2002)..................37

2   *Crest Const. II, Inc. v. Doe*, 660 F.3d 346 (8th Cir. 2011)......................................20

3   *Deutsch v. Masonic Homes of California, Inc.*,

4        164 Cal. App. 4th 748 (2008)...................................................................44

5   *Diallo v. Redwood Invs., LLC*, No. 18-CV-1793 JLS (JLB),

6        2020 WL 6060410 (S.D. Cal. Oct. 14, 2020)................................................11

7   *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) .............................................. 14, 16-17

8   *Dickinson v. Cosby*, 37 Cal. App. 5th 1138 (2019)...................................................48

9   *Doe v. Cap. Cities*,

10       50 Cal.App.4th 1038, 58 Cal.Rptr.2d 122 (Cal. Ct. App. 1996)...................42

11   *Doe v. Roe*, 958 F.2d 763 (7th Cir. 1992) ...............................................................16

12   *Dufour v. Be LLC*, 2010 WL 2560409 (N.D. Cal. June 22, 2010).......................11

13   *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229 (S.D.N.Y. 2011) .................20

14   *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032 (9th Cir. 2003) ..............................34

15   *Facebook, Inc. v. Power Ventures, Inc.*,

16       No. C 08-05780 JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010)............28

17   *Federico v. Superior Ct.*, 69 Cal. Rptr. 2d 370 (Cal. Ct. App. 1997) ...................41

18   *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914 (Cal. 2005)..................33, 34, 36

19   *Gill v. Hearst Pub. Co.*, 40 Cal. 2d 224, 253 P.2d 441 (1953)...............................46

20   *Gregory v. City of Vallejo*, 63 F. Supp. 3d 1171 (E.D. Cal. 2014) ........................39

21   *GSI Tech. v. United Memories, Inc.*, No. 5:13-CV-01081-PSG,

22       2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) ............................................7

23   *Guerrero v. Gates*, 110 F. Supp. 2d 1287 (C.D. Cal. 2000)...................................14

24   *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997) ...........................................23

25   *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648 (9th Cir. 2019) .........................18

26   *Henry Schein, Inc. v. Cook*, No. 16-CV-03166-JST,

27       2017 WL 783617 (N.D. Cal. Mar. 1, 2017)................................................28

28   *Hill v. NCAA*, 7 Cal. 4th 1 (1994)........................................................................45

PLAINTIFF ROSE MCGOWAN'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT

1 | *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) ..................... 13

2 | *Howard v. Am. Online Inc.,* . 208 F.3d 741 (9th Cir. 2000)..................................6-7

3 | *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,

4 |     295 F. Supp. 3d 927 (N.D. Cal. 2018) .........................................................11

5 | *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*,

6 |     2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)...............................................11

7 | *Jarvis v. Regan*, 833 F.2d 149 (9th Cir. 1987)  ....................................................7

8 | *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466 (7th Cir. 2007)..........................5

9 | *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902 (9th Cir. 2011)....................................17

10 | *John D. v. Regents of Univ. of Cal.*, 70 Fed. App'x 466 (9th Cir. 2003)...............15

11 | *Kearney v. Foley & Lardner, LLP*, 747 F. App'x 478 (9th Cir. 2018) ...................14

12 | *Kelly v. United States*, 140 S. Ct. 1565 (2020)....................................................8

13 | *Lateral Link Grp., LLC v. Springut*, No. LACV1405695JAKJEMX,

14 |     2015 WL 12778396 (C.D. Cal. Sept. 22, 2015)...........................................28

15 | *Leonard v. City of Los Angeles*, 208 Fed. App'x 517 (9th Cir. 2006) ...................14

16 | *Martinez v. Costco Wholesale Corp.*,

17 |     481 F. Supp. 3d 1076 (S.D. Cal. 2020) ...................................................39-40

18 | *McMahon v. Craig*, 97 Cal. Rptr. 3d 555 (Cal. Ct. App. 2009)............................36

19 | *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911 (C.D. Cal. 2011) ..................20

20 | *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.*,

21 |     833 F.2d 1360 (9th Cir. 1987)..................................................................8, 12

22 | *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002) ...........................14, 18

23 | *Mintz v. Mark Bartelstein and Assoc. Inc.*,

24 |     906 F.Supp.2d 1017 (C.D. Cal. 2012).........................................................32

25 | *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531 (9th Cir. 1989) ..............30, 32

26 | *Murphy v. Twitter, Inc.*,

27 |     60 Cal. App. 5th 12, 274 Cal. Rptr. 3d 360 (Cal. Ct. App. 2021)..................9

28 | *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994).................14, 15, 17

PLAINTIFF ROSE MCGOWAN'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT

*Native Vill. Of Kivalina v. ExxonMobil Corp.*,

    696 F.3d 849 (9th Cir. 2012)...........................................................................17

*New Box Sols., LLC v. Davis*, No. CV 18-5324-RSWL-KSX,

    2018 WL 4562764 (C.D. Cal. Sept. 18, 2018)..........................................27-28

*Noble v. Sears, Roebuck & Co.*, 33 Cal. App. 3d 654 (1973)................................ 37, 48

*NovelPoster v. Javitch Canfield Grp.*,

    140 F. Supp. 3d 938 (N.D. Cal. 2014) ..............................................................32

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)..................................3, 8, 17

*Opperman v. Path, Inc.,* 87 F. Supp. 3d 1018 (N.D. Cal. 2014) ...................................46

*Ouderkirk v. People for Ethical Treatment of Animals, Inc.*,

    No. 05 10111, 2007 WL 1035093 (E.D. Mich. Mar. 29, 2007) ...................37

*Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*,

    943 F.3d 1243 (9th Cir. 2019)...........................................................................18

*People v. Brock*,

    143 Cal. App. 4th 1266, 49 Cal. Rptr. 3d 879 (Cal. Ct. App. 2006).............25

*People v. Hawkins*, 98 Cal. App. 4th 1428 (2002) ....................................................27

*Perez v. DirecTV Group Holdings, LLC*,

    2019 WL 6362471 (C.D. Cal. July 23, 2019) .................................................10

*Phillips v. TLC Plumbing, Inc.*, 172 Cal. App. 4th 1133 (2009)........................41, 44

*Pinkerton v. United States*, 320 U.S. 640 (1946) .........................................................5

*Prime Partners IPA of Temecula, Inc. v. Chaudhuri*, No. 5:11-CV-01860-ODW,

    2012 WL 1669726 (C.D. Cal. May 14, 2012)...................................................5

*Quan v. Smithkline Beecham Corp.*, 149 F. App'x 668 (9th Cir. 2005) ................45

*Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364 (9th Cir. 1992)...............5, 8, 12

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ...................................................22, 23

*Richards v. City of Los Angeles*,

    2017 WL 7411159 (C.D. Cal. Mar. 31, 2017) ...............................................10

*Sanchez–Scott v. Alza Pharm.*, 86 Cal. App. 4th 365  (2001) ......................................46

*Sanford v. MemberWorks, Inc*., 625 F.3d 550 (9th Cir. 2010)................................17

*Satmodo, LLC v. Whenever Commc'ns, LLC*, No. 17-CV-0192-AJB-NLS,

      2017 WL 6327132 (S.D. Cal. Dec. 8, 2017)................................................28

*Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479 (1985)...................................................3

*Simon Oil Co. v. Norman*, 789 F.2d 780 (9th Cir. 1986) ........................................19

*Smith v. United States*, 568 U.S. 106 (2013) ............................................................5

*Stewart v. Wachowski*, No. 03-2873,

      2005 WL 6184235 (C.D. Cal. June 14, 2005).........................................17, 24

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) ..............................................19

*Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138 (C.D. Cal. 2016).....................23

*Terpin v. AT&T Mobility, LLC*,

      399 F. Supp. 3d 1035 (C.D. Cal. 2019)...................................................29-30

*Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004) ..........................................25

*Ticketmaster, LLC v. Prestige Entertainment West, Inc.*,

      315 F. Supp.3d 1147 (C.D. Cal. 2018)..........................................................31

*Trerice v. Blue Cross of California*, 209 Cal. App. 3d 878,

      257 Cal. Rptr. 338 (Ct. App. 1989)................................................................39

*Turner v. Cook,* 362 F.3d 1219 (9th Cir. 2004)......................................5, 6, 8, 12

*United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc*.,

      837 F.2d 356 (9th Cir. 1988).........................................................................6

*United Food & Commercial Workers Unions & Employers Midwest Health Benefits*

      *Fund v. Walgreen Co*., 719 F.3d 849 (7th Cir. 2013) ...................................20

*United Rentals (N. Am.), Inc. v. Avcon Constructors, Inc*.,

      2014 WL 1270423 (E.D. Cal. March 25, 2014)............................................48

*United States v. Christensen,* 828 F.3d 763 (9th Cir. 2015)..............................27-29

*United States v. Holmes*, No. 5:18-CR-00258-EJD,

      2020 WL 666563 (N.D. Cal. Feb. 11, 2020)..................................................9

*United States v. Stapleton*, 293 F.3d 1111 (9th Cir. 2002).....................5, 11, 19, 23

PLAINTIFF ROSE MCGOWAN'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT

1  *United States v. Utz*, 886 F.2d 1148 (9th Cir. 1989) ................................... 9

2  *Uthe Tech. Corp. v. Aetrium, Inc*., No. 95-02377,

3        2012 WL 4470536 (N.D. Cal. 2012) ................................................. 4

4  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ............................ 30

5  *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs*.,

6        235 F.3d 629 (D.C. Cir. 2001) ........................................................ 7

7  *Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008) ................................................. 22

8  *Wellpoint, Inc. Out-of-Network "UCR" Rates Litig*.,

9        865 F. Supp. 2d 1002 (C.D. Cal. 2011) ................................................. 10, 11

10  *William S. v. Lassen Cty*., No. CIVS051217DFLCMK,

11        2007 WL 1651243 (E.D. Cal. June 5, 2007) ................................................. 39

12  *Williams v. Facebook, Inc*., 364 F. Supp. 3d 1043 (N.D. Cal. 2018) ..................... 31

13  *Williams v. Facebook, Inc*., No. 18-CV-01881-RS,

14        2019 WL 11794250 (N.D. Cal. Aug. 29, 2019) ............................................ 31

15  *Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201 (9th Cir. 2015) ................... 14

16  *Yau v. Santa Margarita Ford, Inc*.,

17        176 Cal. Rptr. 3d 824 (Cal. Ct. App. 2014) ................................................. 38

18

19  **Statutes**

20  18 U.S.C. § 1343 ................................................................................................ 9

21  Cal. Civ. Code § 2307 ........................................................................................ 48

22  Cal. Civ. Code § 2310 ........................................................................................ 48

23  Cal.Code Civ. Proc. § 335.1 ............................................................................... 45

24

25  **Other Authorities**

26  Prosser & Keeton on Torts (5th ed. 1984) ......................................................... 25

27

28

PLAINTIFF ROSE MCGOWAN'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Defendants secretly collaborated to protect Defendant Harvey Weinstein's reputation, to prevent negative public disclosures about him, and to discredit those who threatened to expose his prolific, criminal wrongdoing. They did so through an unlawful, covert scheme to discredit or prevent exposes, including targeting and smearing Plaintiff Rose McGowan. Faced with a litany of additional detailed allegations in McGowan's First Amended Complaint that describe additional victims of the scheme and why the conduct remained hidden for so long, Defendants resort to arguing against straw men, ignoring or misconstruing Plaintiff's new pleadings. Defendants' motions to dismiss should be denied.

## I.     BACKGROUND

### A. Procedural History

On December 7, 2020, the Court granted in part and denied in part Defendants' motions to dismiss McGowan's original Complaint. The Court held that McGowan had pled colorable fraud claims with sufficient particularity under Rule 9(b)—fraud that serves as the foundation of McGowan's other claims. (Opinion at 17–19.) The Court also held that McGowan sufficiently alleged vicarious liability such that the Bloom, Boies, and Weinstein Defendants are liable for the fraud perpetrated by Defendant Black Cube's agents. (Opinion at 17.) The Court also found that McGowan had adequately pled concrete damages that were caused by Defendants' fraudulent conduct—again, damages and conduct that serve as the basis for her other claims. (Opinion at 18–19.) The Court dismissed McGowan's RICO and RICO conspiracy claims because it found that she did not adequately plead that the Defendants' scheme had more than a singular plan and purpose with a single victim—McGowan herself— and because there was no threat of future racketeering activity after Weinstein's misconduct became public and McGowan's book, *Brave*, was published. (Opinion at 10–14.)

Her invasion-of-privacy, intentional infliction of emotional distress, and

1  negligent-hiring-and-supervision claims were dismissed because the Court found that

2  McGowan failed to adequately plead when and how she discovered the conduct that

3  underlies those claims and why she could not have discovered those facts sooner.

4  (Opinion at 20–22, 28–31.)

5          **B. McGowan's FAC**

6          With leave, McGowan amended her complaint to address the Court's reasons

7  for dismissing various state torts, the Computer Crimes Act claim and RICO Claims.

8  She chose *not* to re-allege the Federal Wiretap Act, Bane Act, and conversion claims.

9          Relative to the RICO claims, she added extensive factual allegations concerning

10 the operation, goals, and victims of the long-running Weinstein-Protection Enterprise.

11 These new allegations include:

12 -  Description of the full scope of the Weinstein-Protection Enterprise goals,

13    including "maintaining WEINSTEIN's media and filmmaking empire,

14    obtaining MCGOWAN's unpublished *Brave* manuscript, and obtaining or

15    stopping the printing of intellectual property contained within various

16    newspapers and magazines, including *The New York Times*, the *New Yorker*,

17    and *New York Magazine*" (First Amended Complaint, "FAC" ¶ 158);

18 -  The Enterprise's target list of victims reaching far beyond Rose McGowan,

19    including former Weinstein employees, as well as journalists Adam Moss and

20    reporters for the *New York Times*, as well as other women Weinstein had raped,

21    assaulted, or sexually harassed, including Rosanna Arquette and Annabella

22    Sciorra (FAC ¶¶ 51–61);

23 -  Weinstein's and Boies's attack in 2015 on Ambra Battilana Gutierrez, an Italian

24    model whom Weinstein sexually assaulted, including killing stories about the

25    assault, discrediting Gutierrez in the press, and pressuring the New York District

26    Attorney not to pursue charges against Weinstein despite having a recorded

27    admission from Weinstein (FAC ¶¶ 30–35);

28 -  The Enterprise's targeting of yet another perceived media enemy, Ben Wallace

of *New York Magazine*, to obtain as much of his reporting as possible under false pretenses (FAC ¶¶ 51–57);

- The Enterprise's targeting of Ronan Farrow of *The New Yorker* including deploying a Black Cube agent to secure his reporting under false pretenses (FAC ¶¶ 58, 99);

- The manner in which Defendants, through their agents, accessed McGowan's computer on multiple occasions through fraud and deception in order to steal portions of McGowan's unpublished book that was saved on her computer (FAC ¶¶ 129, 199, 201–202, 204).

Beyond this, McGowan has newly detailed her discovery within the applicable statutes of limitation of the facts needed to bring suit, and why she was unable to discover these facts earlier (FAC ¶¶ 141-146, 194, 218, 232).

Despite these amendments clearly addressing the Court's concerns, the Defendants have each re-filed motions to dismiss.

## II.   ARGUMENT

This Court must accept the FAC's well pleaded allegations as true and construe them in the light most favorable to McGowan.  Fed. R. Civ. Proc. 12(b)(6).

### A. McGowan's RICO claims stand:

"RICO is to be read broadly," and to "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985) (reversing dismissal of RICO claim); *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (reversing dismissal of RICO claim). Nevertheless, Defendants resort to arguments that ignore her new allegations, or that create straw men, or that flat-out misstate the law.  In each case, Defendants' arguments fail.

#### 1. McGowan successfully pleads that Defendants engaged in a pattern of racketeering activity.

McGowan's new allegations clarify that the Weinstein-Protection Enterprise was *not* focused solely on obtaining McGowan's book and stopping its publication.

1  Rather, the well pleaded facts this Court must accept establish decades of concerted
2  activity to protect Weinstein *prior* to McGowan's book becoming a focus, as well as
3  continued efforts *after* the book's publication. The FAC demonstrates that the
4  enterprise had multiple goals: to discredit *any* Weinstein accuser, prevent *all* negative
5  stories about him, and discredit *everyone* who threatened to expose him. Accordingly,
6  Defendants targeted not only McGowan, but multiple reporters and victims of his
7  sexual misconduct.

8               **a.   McGowan adequately alleges closed-ended continuity.**

9                   **i.   The racketeering activity alleged in the FAC spans a**
10                         **sufficiently long time period.**

11     Ignoring Ninth Circuit case law and the FAC's allegations, Defendants argue
12  that McGowan has not alleged closed-ended continuity because the racketeering
13  activity took place over too short a time period and was too sporadic. (Black Cube
14  Mot. 7–8; Bloom Mot. 8.)

15     The Weinstein-Protection Enterprise operated for decades to silence
16  Weinstein's accusers (FAC ¶ 156) and engaged in documented illegal conduct as part
17  of this scheme from 2015 to 2020 (*see, e.g.,* FAC ¶¶ 33–35, 61). Even if the Court
18  were to look narrowly at the time when McGowan alleges specific wire-fraud only as
19  to her, that conduct spans over a year—from October 2016 to October 2017. (FAC ¶¶
20  43–44, 50, 53, 54, 58, 61, 66, 71, 77, 84–91, 99, 108–109, 111–13, 116, 123–24, 126,
21  168, 140–41). This is more than sufficient to fulfill the pattern requirement under
22  RICO. *See, e.g., Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
23  818 F.2d 1466, 1469 (9th Cir. 1987) (holding predicate acts of fraud over five-month
24  period sufficient to satisfy RICO's pattern requirement); *Uthe Tech. Corp. v. Aetrium,*
25  *Inc.*, No. 95-02377, 2012 WL 4470536, at *5 (N.D. Cal. 2012) (denying motion to
26  dismiss RICO claim as "it cannot be determined at the pleading stage, as a matter of
27  law, that a six-month period does or does not constitute a 'substantial period' of time").
28  And while the Bloom Defendants try to argue that the RICO claims fail against them

because their specific conduct spanned a shorter time period, (Bloom Mot. 8), this argument fails because, as explained in greater detail in Section IIA(1)(b)(iv), they are liable for the other Defendants' conduct. *See United States v. Stapleton*, 293 F.3d 1111, 1116-18 (9th Cir. 2002); *see also Smith v. United States*, 568 U.S. 106, 111 (2013) ("a defendant who joins a [RICO] conspiracy . . . becomes responsible for the acts of his co-conspirators in pursuit of their common plot"); *see also Pinkerton v. United States*, 320 U.S. 640 (1946).

Despite Defendants' argument otherwise, no rule holds that racketeering activity must extend beyond a year. Defendants place much emphasis on *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364 (9th Cir. 1992). (Black Cube Mot. 8; Bloom Mot. 8). However, the case is materially inapposite, because the entire scheme there lasted a few months—from "spring" 1985 to October 1985. *Id*. at 367. And while the *Wollersheim* court stated that it had found no Ninth Circuit case that found activity lasting less than a year sufficient to establish a pattern, *id*. at 366–67, the Ninth Circuit did just that in *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1469 (9th Cir. 1987) (a series of misrepresentations for five months constitutes a "pattern" for purposes of RICO but affirming summary judgment on other grounds). Further, *Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir.1995) followed *Wollersheim*, and explicitly the rejected the one-year rule to fulfilling RICO's pattern requirement. *Allwaste*, 65 F.3d at 1528. The other cases Defendants cite in support are clearly distinguishable. (Black Cube Mot. 8). In *Jennings v. Auto Meter Prod., Inc.*, the conduct at issue took place over less than ten months and the court emphasized "only a few allegedly fraudulent acts took place." 495 F.3d 466, 474 (7th Cir. 2007). And in *Prime Partners IPA of Temecula, Inc. v. Chaudhuri*, the plaintiffs did not even contend that the enterprise had closed-ended continuity. No. 5:11-CV-01860-ODW, 2012 WL 1669726, at *7 (C.D. Cal. May 14, 2012).

Nor are the allegations too "sporadic" to form a pattern. (Black Cube Mot. 7–8.) The Defendants cite *Turner v. Cook* to argue that McGowan's allegations—

although spanning at least a year—are nonetheless not continuous because they are too sporadic. 362 F.3d 1219, 1230 (9th Cir. 2004). But in *Turner*, the bulk (94) of the communications that constituted the racketeering conduct took place over two months, with only a smattering of a few more communications over the remaining seven months. *Id*. There is nothing sporadic about the racketeering conduct here—the wire fraud was not clumped together over a short time period but instead was evenly spread out over at least a year. (FAC ¶¶ 43–44, 50, 53, 54, 58, 61, 66, 71, 77, 84–91, 99, 108–109, 111–13, 116, 123–24, 126, 168, 140–41).

### ii. The FAC allegations establish the Enterprise was involved in conduct focused on multiple plans with multiple victims.

Defendants cling to the Court's previous opinion in maintaining that McGowan has pled nothing more than a single plan to defraud her of her book—an argument that ignores Plaintiff's revisions to the FAC. (Black Cube Mot. 7; Bloom Mot. 7–8; Weinstein Mot. 5–6; Boies Mot. 7–13.) The FAC details the Enterprise's multiple plans to target victims that go far beyond Defendants' plan to discredit McGowan— plans reaching multiple victims over decades. (FAC ¶¶ 22–24, ¶¶ 30–35.) McGowan additionally pleads, in detail, how Defendants targeted Ben Wallace, Adam Moss, and Ronan Farrow—reporters working on pieces about Weinstein's conduct—by sending Black Cube spies to defraud the journalists and to try to steal as much of their work product as possible. (FAC ¶¶ 43–44, 50, 53–54, 58, 61, 99, 108–109, 111–113, 124.)

The Bloom Defendants simply cut and pasted arguments from their prior motion to dismiss without even attempting to address the allegations actually at issue in the FAC. (Bloom Mot. 6–8.) The cases they cite do nothing to defeat McGowan's RICO claim, given the new allegations. *United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc*., actually supports McGowan, not Defendants, because there the court reversed the dismissal of plaintiff's complaint, finding it unnecessary for RICO plaintiffs to allege multiple criminal episodes or fraudulent schemes. 837 F.2d 356, 360-61 (9th Cir. 1988). *Howard v. Am. Online Inc.* found that the plaintiffs failed to

allege closed-ended continuity, but only because the predicate activity lasted only four months. 208 F.3d 741, 750 (9th Cir. 2000). In *Jarvis v. Regan*, the defendants were alleged to have manipulated a granting agency to obtain funds, but the scheme was "isolated and presented no threat of continuing." 833 F.2d 149, 153 (9th Cir. 1987). *GSI Tech. v. United Memories, Inc*. solely concerned the acquisition of a contract. No. 5:13-CV-01081-PSG, 2014 WL 1572358, at *5 (N.D. Cal. Apr. 18, 2014). This might be an analogous case were the Enterprise's sole aim acquiring McGowan's book. But as clearly detailed in the FAC, that is one of many objectives here.

Other Defendants argue that the extensive new pleadings are "cosmetic," and that the pleadings still amount only to a single scheme to defraud a single victim. (Boies Mot. 8–9; Weinstein Mot. 5) The FAC is very different, however, from *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs*., 235 F.3d 629 (D.C. Cir. 2001), Defendants' case in support. There, plaintiff's amended pleadings "artificially" subdivided defendant's fraudulent activity into multiple "schemes" which the court found amounted to "a vain attempt to make a RICO claim seem more viable by parsing one scheme into multiple schemes." *Id.* at 635. This might be a valid concern had McGowan attempted to arbitrarily divide Defendants' scheme to steal her book into sub-schemes. But the FAC greatly expands the universe of conduct and details Defendants' long campaign to silence Weinstein's accusers, avoid accountability, steal McGowan's unpublished manuscript, and obtain and stop the publication of articles in *The New York Times*, *The New Yorker*, and *New York Magazine*. (*See* FAC ¶¶ 8, 22, 23, 24, 29– 35, 44, 51–61, 99, 100).

Nor are Defendants correct that these new allegations lose force because they do not involve racketeering activity. That may be the defense argument, but the Rules of Procedure require this Court to credit McGowan's specific claims that wire fraud furthered these plans.  She specifically alleges how wire communications were used to try to obtain reporters' work product regarding Weinstein's misconduct through fraud, (FAC ¶¶ 43–44, 50, 53–54, 58, 61, 99, 108–109, 111–13, 124), and how wires

1    are reasonably assumed to have been used to target Gutierrez (FAC ¶ 35).[1,2]

2
3                            iii.   **McGowan adequately alleges multiple victims of
                                    Defendants' wire fraud.**

4            Next, Defendants argue that McGowan failed to allege any other victims of wire
5    fraud except for her because she did not plead that Defendants intended to obtain
6    property from these other victims and because Defendants failed to obtain property
7    from them. (Black Cube Mot. 7–8; Weinstein Mot. 5–6; Boies Mot. 9–13.) These
8    arguments fail.

9            First, intent can be pled generally. *Odom v. Microsoft Corp.*, 486 F.3d at 554
10   (9th Cir. 2007). McGowan pled that Defendants "intended to defraud" her and others
11   of their property through Black Cube agents. (FAC ¶ 159). This allegation, coupled
12   with factual allegations that precede that allegation, (*id.* ¶¶ 51–58), sufficiently pleads
13   that Defendants used Black Cube agents to target journalists working on articles about
14   Weinstein with the aim of obtaining as much of their work product as possible so they
15   knew what the journalists were intending to say—and thus whether it was necessary
16   to kill the story. These facts stand in contrast to *Kelly v. United States*, where the impact
17   on toll road employees' time and labor was merely incidental to a scheme targeting

18   _____

19   [1] Despite Defendants' argument to the contrary, McGowan is not asserting that sexual
20   assault, entering legal settlements, and defamation are predicate acts. (Boies Mot. 9–
     13; Weinstein Mot. 6.) FAC allegations concerning the history of Weinstein's sexual
21   assault, defaming those who did not succumb to his advances, and pressuring victims
22   to sign confidential settlement agreements simply describe the enterprise's scope and
     goals. McGowan has pled that Defendants targeted multiple victims through wire fraud
23   as predicate acts. (*See* FAC ¶ 161.)

24   [2] The Bloom Defendants also cite cases to support their argument that McGowan's
25   FAC only alleges a brief racketeering aimed at a single goal. As explained in Section
     IIA(1)(b), *Turner v. Cook* and *Religious Tech. Ctr. V. Wollersheim* are distinguishable.
26   *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc*. is similarly
     distinguishable as the enterprise's role was solely "to induce [the plaintiff] to form the
27   joint venture in order to obtain the broadcast rights from the promoters." 833 F.2d
28   1360, 1364 (9th Cir. 1987). McGowan's allegations concern far broader conduct.

the regulation of toll lanes to punish a city's mayor for refusing to support former New Jersey Governor Chris Christie's re-election campaign. 140 S. Ct. 1565, 1566 (2020). Nor is it similar to *United States v. Holmes*, where a scheme to sell faulty medical tests to patients did not actually target patients for their money because third parties, such as insurance companies, paid for many of the tests. No. 5:18-CR-00258-EJD, 2020 WL 666563, at *18 (N.D. Cal. Feb. 11, 2020).

The Boies and Weinstein Defendants also argue, without any legal support, that halting the publication of articles cannot be wire fraud. (Boies Mot. 12–13; Weinstein Mot. 6.) That is not what McGowan is alleging, however. Like Defendants' targeting of McGowan's manuscript, she alleges that Defendants sent their agents to journalists suspected of writing articles about Weinstein's conduct to try to steal as much of their work product as possible and/or—through fraudulent means—to ascertain what they were intending to say about Weinstein. (*See, e.g.,* FAC ¶¶ 158–61.) None of the Defendants cite to any California law stating that journalists have no property interest in their work product. Nor can they. *See Murphy v. Twitter, Inc.,* 60 Cal. App. 5th 12, 274 Cal. Rptr. 3d 360, 381 (Cal. Ct. App. 2021) (acknowledging in dicta that a journalist has a property interest in tweets).

Defendants' secondary argument that the journalists were not victims of wire fraud because Defendants failed to steal their work product is also unavailing. (Boies Mot. 13; Weinstein Mot. 6; Black Cube Mot. 7.) The wire-fraud statute does not require that a party be successful in defrauding another of their property. *See* 18 U.S.C. § 1343 ("Whoever, having devised *or intending to devise* any scheme…") (emphasis added); *see also United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (holding that, "a scheme to defraud, *whether successful or not*," amounts to mail fraud "as long as the jury was required to find an intent to obtain money or property from the victim of the deceit") (internal quotations omitted) (emphasis added). The court in *Holmes*— a case Defendants cite—acknowledged this. 2020 WL 666563 at *18. Therefore, whether or not Defendants succeeded in obtaining the journalists' work product does

1   not control here. What matters is that McGowan has pled they intended to obtain
2   property through fraud and used wires in aid of that plan. (FAC ¶¶ 156, 158–61.)

3       McGowan has clearly pled that the Enterprise had goals beyond just discrediting
4   and silencing McGowan via wire fraud. Even with the most conservative reading, she
5   has at the very least alleged that the Enterprise goals included obtaining work product
6   from journalists to ascertain its threat to Weinstein. As the Enterprise used Black Cube
7   agents to contact these journalists over wired communications and, through
8   subterfuge, to try to obtain as much of the journalist's work product as possible, the
9   Enterprise targeted—and made victims of—these journalists.

10      McGowan has adequately alleged closed-ended continuity.

11          **iv.   McGowan adequately pled a pattern of racketeering**
12              **activity as to the Bloom Defendants.**

13      Pasting arguments from prior briefs, the Bloom Defendants again argue that
14  McGowan failed to allege a pattern of racketeering activity as to them and instead only
15  pled one act—an email that Bloom sent to Weinstein in FAC ¶ 161(d). (Bloom Mot.
16  6–8.) McGowan alleges, however, that the Bloom Defendants played a direct role in
17  other Defendants' conduct, including supervising and meeting with the Black Cube
18  spy who was deceiving McGowan. (FAC ¶¶ 74, 160(c), 92, 117, 120.) Such allegations
19  establish the Bloom Defendants' participation in those acts. The cases the Bloom
20  Defendants cite, involving defendants who acted separate and apart from their co-
21  defendants, are inapt under this lens. (*See, e.g.*, Bloom Mot. 6–7 *citing Wellpoint, Inc.*
22  *Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002 (C.D. Cal. 2011), *Richards*
23  *v. City of Los Angeles*, 2017 WL 7411159 (C.D. Cal. Mar. 31, 2017) (both dismissing
24  complaints for lack of pleading involvement with co-defendants' activities)).[3]

25

26  [3] In a case Bloom cites, *Perez v. DirecTV Group Holdings, LLC*, 2019 WL 6362471,
27  *4 (C.D. Cal. July 23, 2019), (Bloom Mot. 7), the court held that plaintiff's overall
28  allegations plausibly raised the possibility that wirings involving one defendant were
                                                          (Continued...)

Further, Bloom fails to acknowledge that as a matter of law knowing participants in a fraudulent scheme are liable for their co-schemers' use of wires per *Stapleton*, 293 F.3d at 1116-18. Here, McGowan pleads that Bloom and the other defendants "each...intended to defraud MCGOWAN...knowing[ly] and intending" to participate in a scheme, (FAC ¶ 159), which involved numerous wires in furtherance of the scheme, as detailed in Subparagraphs 161(a)-(x) of the FAC. Moreover, "[i]t was reasonably foreseeable to all Defendants that wires would be used, and were actually used" to further the fraud. *Id*. ¶ 161, *see also* fn. 3. Because the FAC alleges that Bloom knowingly participated in the scheme, she is liable for all of the underlying wires, which number far more than two. *See, e.g., In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig*., 295 F. Supp. 3d 927, 979-80 (N.D. Cal. 2018) (holding each co-defendant "liable for FCA US's use of the mails and wires in furtherance of the scheme," because of *Stapleton*); *Dufour v. Be LLC*, 2010 WL 2560409, *11 (N.D. Cal. June 22, 2010) (denying motion to dismiss on same grounds); *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig*., 2017 WL 4890594, *12-*13 (N.D. Cal. Oct. 30, 2017) (noting *Stapleton* controls over the *Wellpoint* case Defendants cite, and denying motion to dismiss because "each member of the scheme does not need to make a separate misrepresentation").

---

shared with other defendants. That is certainly plausible here, where McGowan alleges defendants communicated with each other about the scheme. (FAC ¶¶ 71, 73, 74, 121, 138.) This case therefore counsels against dismissal on these grounds. The Bloom Defendants also cite to *Diallo v. Redwood Invs., LLC*, No. 18-CV-1793 JLS (JLB), 2020 WL 6060410, at *9 (S.D. Cal. Oct. 14, 2020), which explicitly recognizes that a plaintiff may fulfill the RICO pattern requirement by way of agency. *Id*. at *9. There, the plaintiff only pled legal conclusions that the defendants were agents, without any factual allegations to back up those conclusions. *Id*. This is far from the situation here where McGowan has pled factual allegations as to Bloom's agency relationship with the other Defendants. (*See, e.g.,* FAC ¶¶ 74, 92, 94–95, 97, 100, 117, 121, 127, 129, 130, 160(c).)

The Bloom Defendants' additional arguments that McGowan had only pled a scheme with a single goal and victim are fully addressed in Sections IIA(1)(b)(ii) and (iii), respectively.

### b.    McGowan adequately alleges open-ended continuity.

Defendants alternately argue that McGowan failed to plead open-ended continuity. (Black Cube Mot. 6–7; Bloom Mot. 8.) McGowan's greatly expanded FAC makes clear that the goals of the Enterprise remain alive and thus allege open-ended continuity.

The case Defendants cite in support of their argument, *Turner v. Cook*, 362 F.3d 1219 (9th Cir. 2004), held that collecting a money judgment was an act "finite in nature," and since that was the only scheme presented, no open-ended continuity existed for RICO purposes under the facts of that case. Indeed, the plaintiffs in *Turner* admitted that theirs was a closed-ended RICO claim that would not repeat unless "the judgment remained unpaid." *Id.* at 1230. These facts simply cannot assist in a decision here; they are far afield. The Bloom Defendants also cite to *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992), where the court found that the plaintiff failed to allege open-ended continuity because the "only goal … was the successful prosecution of the *Wollersheim* state tort suit, [so] there was no threat of activity continuing beyond the conclusion of that suit." *Id.* Similarly, the Bloom Defendants cite to *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc*., 833 F.2d 1360, 1364 (9th Cir. 1987), where the plaintiff's allegations "concern[ed] a single fraudulent inducement to enter a contract. Once the joint venture had acquired the broadcast rights, the fraud, if indeed it was a fraud, was complete."

Here, unlike in the above cases, McGowan specifically alleges that Defendants' scheme continued *after* she published her book, FAC ¶¶ 148-49. She expressly pleads that "[a]lthough new persons joined the WEINSTEIN-PROTECTION ENTERPRISE over time, it has existed and sought to accomplish its purposes since no later than the late 1990s, and has continued at least to 2020." (FAC ¶ 156.) The FAC also pleads

specific facts supporting this allegation in that Defendants' efforts to smear and silence McGowan continued even after the *New York Times* and *New Yorker* articles' publication in October 2017 and after *Brave*'s release in January 2018. (*Id*. ¶¶ 137–41.) Further, the allegations of the FAC lay out goals that are far broader than just the publication of *Brave*. (*See* FAC ¶¶ 22–24, 30–35, 43–44, 50, 53-54, 58, 61, 99, 108–109, 111-13, 124.) The goal of the conduct—protecting Weinstein from the consequences of his history of assault—is not necessarily time limited, like collecting a judgment, prosecuting a tort suit, or entering into a contract. Indeed, the goal—and therefore the threat of ongoing racketeering activity—continues to this day as there are likely additional victims who have not come forward who Weinstein could still be prosecuted for assaulting. He and his team of co-conspirators therefore still have reason to keep them—and anyone else who threatens to speak out—silent. *See H.J. Inc. v. Northwestern Bell Telephone Co*., 492 U.S. 229, 242 (1989) (reversing dismissal of RICO claim; continuity can be shown through "repetition extending indefinitely into the future").

## 2.  McGowan alleges concrete economic injuries.

Defendants repeat their previously briefed arguments that McGowan failed to identify an injury to her business or property. (Weinstein Mot. 7–8; Black Cube Mot. 9–10; Bloom Mot. 12–13.) Defendants' argument again fails. McGowan specifically alleged that she "has been injured in her business and property, suffering concrete financial losses," which she then enumerated as:

-   interruption and termination of McGowan's relationships with commercial partners; fees and costs paid to McGowan's literary agents;
-   legal fees and costs associated with the criminal drug possession case and Weinstein's efforts to prevent *Brave*'s publication;
-   decreased book sales;
-   lost employment opportunities;
-   lost commercial opportunities including film, television, book, and other media

1    projects; and

2    -   harm to McGowan's business reputation.

3  (FAC ¶ 165.) These are just the sort of concrete economic injuries Courts have

4  routinely found cognizable under RICO. *See Diaz v. Gates*, 420 F.3d 897, 900-01 (9th

5  Cir. 2005) (reversing dismissal of RICO claim where plaintiff alleged harm amounting

6  to tortious interference with contract and interference with prospective business

7  relations); *Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201, 1203 (9th Cir. 2015)

8  (allegations that plaintiffs lost specific business opportunities and contracts due to

9  racketeering conduct were sufficient); *see also Nat'l Org. for Women, Inc. v. Scheidler*,

10  510 U.S. 249, 256 (1994) (reversing dismissal of RICO claim because, at pleading

11  stage, general factual allegations of injury are sufficient); *Mendoza v. Zirkle Fruit Co*.,

12  301 F.3d 1163, 1168-71 (9th Cir. 2002) (reversing dismissal of RICO claim because

13  plaintiff's allegation of lost wages sufficient to state claim of concrete economic injury

14  under RICO); *Leonard v. City of Los Angeles*, 208 Fed. App'x 517, 519 (9th Cir. 2006)

15  (reversing dismissal of RICO claim where plaintiffs' allegation of costs they incurred

16  as a result of the fraud sufficiently alleged injury to business or property); *Burger v.*

17  *Kuimelis*, 325 F. Supp. 2d 1026, 1035 (N.D. Cal. 2004) (legal expenses incurred in

18  other proceedings as result of RICO injury recoverable). Further, at least one other

19  court in this district found that harm to business reputation was compensable under

20  RICO. *See Guerrero v. Gates*, 110 F. Supp. 2d 1287, 1293 (C.D. Cal. 2000) (denying

21  12(b)(6) motion because complaint alleged loss of employment, loss of business

22  opportunities, and damage to professional reputation, all of which are cognizable

23  injuries to business or property for RICO purposes).

24      As delineated above, McGowan does *not* allege emotional-distress damages

25  under RICO, so the Defendants' cases that simply state that emotional-distress

26  damages are not cognizable under RICO are irrelevant. *See Kearney v. Foley &*

27  *Lardner, LLP*, 747 F. App'x 478, 481 (9th Cir. 2018). Further, *Chaset v. Fleer/Skybox*

28  *Int'l, LP* addressed a complaint by baseball-card purchasers who claimed they suffered

a loss when they did not receive "insert cards." 300 F.3d 1083, 1086 (9th Cir. 2002). The Ninth Circuit affirmed dismissal of the RICO claim because "[p]urchasers of trading cards do not suffer an injury cognizable under RICO when they do not receive an insert card." *Id*. at 1087. *Chaset* has nothing to do with reputational harm.

Nor has McGowan failed to plead RICO damages with sufficient specificity and concreteness. According to the Supreme Court, McGowan's pleading that she sustained injuries to her business and property interests, detailed in Paragraph 165, is sufficient at this stage. *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. at 256 (reversing dismissal of RICO claim because, at pleading stage, general factual allegations of injury are sufficient); *see also John D. v. Regents of Univ. of Cal.*, 70 Fed. App'x 466, 467 (9th Cir. 2003) (reversing dismissal of RICO claim because plaintiffs' complaint alleged "loss and injury to their personal property," "loss of money," and "loss of other 'cognizable' property interests," which is all that is required). This is especially so because McGowan pled detailed facts supporting these injuries, such as:

- *Interruption and termination of her relationships with commercial partners*: McGowan's Complaint details how the Weinstein-Protection Enterprise's conduct, which included releasing derogatory statements about McGowan the day *Brave* was published, resulted in interruption of her book tour and resulting interference with her relationships with her publisher and the retailers involved in her book tour, FAC ¶¶ 148, 152;

- *Fees and costs paid to her literary agents/lost book sales*: McGowan describes how, unknown to her at the time, the literary agents she hired to promote her book were part of the Weinstein-Protection Enterprise and undermined her efforts, *id*. ¶¶ 38-39, 83-87, 88-91, 109-10, 152;

- *Legal fees and costs associated with the criminal drug-possession case and Weinstein's efforts to prevent Brave's publication*: McGowan details efforts by the Weinstein-Protection Enterprise to cause her to plead no contest to charges

she denied as a means to suppress her defense, as well as to try to bribe her not to release *Brave*, and specifically pleads that she had to retain attorneys in connection with these events, *id*. ¶¶ 79-82, 132-33, 152; and

- *Lost employment and commercial opportunities including film, television, book, and other media projects*: The Complaint specifically alleges Weinstein's purported interference with McGowan's business relationship with Amazon Studios and the resulting damage to her efforts to make a television series she scripted, as well as Weinstein's overall efforts "to shame, silence, and ruin MCGOWAN," *id*. ¶¶ 62-64, 151.

The enumerated injuries are therefore nothing like those pled in *Camarillo v. City of Maywood*, No. CV 07-3469 ODW (SHX), 2008 WL 4056994, at *2 (C.D. Cal. Aug. 27, 2008), where the plaintiff pled baldly that due to an arrest he had been unable to work. *Id. Berg v. First State Ins. Co*., 915 F.2d 460, 464 (9th Cir. 1990) is similarly distinguishable. There, plaintiffs' injuries were limited to cancellation of their insurance policies with no accompanying monetary loss. *Id.*  That is simply not the case here. Rather, McGowan details economic harm, and factual support for that harm, (*see, e.g.,* FAC ¶¶ 62–64, 77–82, 148, 149, 152, 165), as well as pleading that the contract with Black Cube explicitly included halting the publication of McGowan's book. (FAC ¶ 118–19.)

Likely recognizing that McGowan has properly pled injury to her business or property, Defendants also argue that her business and property injuries are "derivative of" her personal injuries and therefore not cognizable under RICO. (Black Cube Mot. 9–10; Weinstein Mot. 7–8; Boies Mot. 14). No such rule exists in the Ninth Circuit. The "derivative" language originates from *Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992). It recognized that the question "whether a particular interest amounts to property is quintessentially a question of state law," and it turned on Illinois law. *Id*. at 768. The case Defendants hold up for the proposition that derivative monetary losses are not cognizable, *Diaz*, states no such thing. *Diaz* quotes from *Doe* simply to agree

with the Seventh Circuit's assessment that courts must reference state law to determine whether an injury qualifies as a specific business or property interest. 420 F.3d at 900. However, after doing so, the Ninth Circuit found that the *Diaz* plaintiff's lost wages were cognizable under California law. *Id*. Moreover, the Ninth Circuit *explicitly rejected* the dissenting opinion's argument that the plaintiff's lost-wages damages were not cognizable as they were "merely derived from" his personal injury. *Id*. at 901. Defendants cite no basis to dismiss this RICO claim as "merely derivative."

### 3.  McGowan adequately pled Defendants caused her Damages.

Defendants also try to argue that the causal connection between McGowan's damages and Defendants' racketeering activity is too attenuated. (Black Cube Mot.10–12; Boies Mot. 13–14; Weinstein Mot. 8; Bloom Mot. 10–12.) These same arguments were tried in the first round of briefing and not adopted.

McGowan unambiguously pled that the Defendants' racketeering activities were a "direct and proximate cause" of injuries identified. (*See, e.g.*, FAC ¶ 165.) McGowan is not obliged to plead more. "The only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself." *Odom*, 486 F.3d at 554; *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (same); *Stewart v. Wachowski*, No. 03-2873, 2005 WL 6184235, at *14 n. 73 (C.D. Cal. June 14, 2005) (same holding, in a case Defendants cite). Furthermore, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women, Inc.*, 510 U.S. at 256 (finding RICO standing based on such allegations).[4]

Notably, none of the Defendants engage with the actual factors that the Ninth Circuit uses to assess causation. These factors are: 1) whether there are more direct

---

[4] This remains the law post *Iqbal* and has been cited consistently throughout the Ninth Circuit including in *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 911-12 (9th Cir. 2011), and *Native Vill. Of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012).

victims of the scheme who are better positioned to sue, 2) whether there will be difficulty in determining the portion of damage that is attributable to the unlawful conduct, and 3) whether there is risk of duplicative recoveries. *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 652 (9th Cir. 2019). These factors weigh against dismissing McGowan's RICO claim. The first and third factors require little discussion, for there is no other potential plaintiff. Although other Weinstein victims could potentially bring their own cases based on whatever specific facts relate to them, McGowan is as well positioned as any victim to sue and seek damages, and she is the only one who can seek damages specific to herself. As to the second factor, there is no identified intervening cause to McGowan's harm. To imagine one would require adopting negative inferences this Court is not allowed to adopt in this procedural posture. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (it "is inappropriate at [the 12(b)(6) stage to substitute speculation for the complaint's allegations of causation.").

Furthermore, this Court already found that McGowan properly pled concrete damages that were caused by Defendants' fraud. (Opinion at 18-19.) The Court so found because McGowan pled that, because of Defendants' fraudulent conduct, she "ended up revealing sensitive information that prepared Defendants to discredit and malign her publicly, undermining her book, commercial projects, and reputation causing her damages." (Opinion at 18.) The Court also pointed to the damages enumerated in what is now Paragraph 152 of the FAC. (*Id*.) Together, the Court found that the allegations sufficiently pled concrete damages caused by Defendants' fraudulent conduct. (Opinion at 18–19.) Similarly, McGowan pleads that, as a "direct and proximate result of Defendants' racketeering activities" she has been injured, and specifically enumerated those injuries. (FAC ¶ 165.) This, paired with the allegations in Paragraph 152, pleads concrete damages caused by Defendants' racketeering activity. *See Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co*., 943 F.3d 1243, 1251 (9th Cir. 2019) (district court erred in dismissing

1   RICO claim based on lack of standing, because plaintiffs alleged they were immediate
2   victims of scheme); *Simon Oil Co. v. Norman*, 789 F.2d 780, 781 (9th Cir. 1986)
3   (reversing dismissal of RICO claim because plaintiff is not required to plead any injury
4   distinct from that caused by the predicate acts themselves). There is no basis for the
5   Court to find otherwise.

### 4.  McGowan properly alleges a RICO enterprise.

7        The Bloom Defendants alone argue that McGowan failed to properly allege a
8   RICO enterprise. (Bloom Mot. 13–15.) The argument is again wholly rehashed from
9   their prior motion to dismiss McGowan's original Complaint, which the Court
10  reviewed and declined to adopt. The argument is muddled and conflates legal concepts
11  but appears to be that McGowan improperly lumped the Defendants together and that
12  McGowan failed to plead "any ascertainable structure or decision-making process
13  distinct from" the predicate racketeering acts. (*Id.*)

14       McGowan does not improperly lump the Defendants together. Bloom's
15  particular role is itemized in Paragraphs 71, 72, 73, 74, 82, 88, 92, 97, 102, 103, 115,
16  117, 121, 135, 136, 137, 138 in the FAC. Further, the Bloom Defendants ignore, as
17  outlined in Section IIA(1)(a)(iv), that Bloom is liable for the conduct of her co-
18  conspirators. *See Stapleton*, 293 F.3d at 1116-18. This derives from controlling Circuit
19  law. In short, the FAC stands in stark contrast to the complaint in *Swartz v. KPMG*
20  *LLP*, 476 F.3d 756, 765 (9th Cir. 2007), where the plaintiff pled broadly about various
21  defendants engaging in fraudulent conduct, while attributing specific conduct to two
22  of the defendants. *Id.* at 765.

23       Nor does McGowan rely on using the word "enterprise" to plead the necessary
24  elements of the Weinstein-Protection Enterprise. McGowan pleads a common
25  undertaking "to protect WEINSTEIN's reputation, prevent negative public disclosures
26  about him, and discredit those who might accuse him of wrongdoing or expose that
27  wrongdoing," which was a goal before the events at issue and after McGowan's
28  manuscript was stolen and later published. (FAC ¶ 156.) For Bloom, it was important

1    to preserve Weinstein's status, apart from her professional role as a lawyer, to secure
2    his help getting her "book—Suspicion Nation…[turned] into a mini-series. In
3    exchange for BLOOM's help discrediting MCGOWAN, WEINSTEIN did just that."
4    (FAC ¶ 70.) The FAC names half a dozen other targets of the enterprise, including
5    media and actresses. (FAC ¶ 156.) It is plausible that Harvey Weinstein was working
6    with a team this way for years, including through fraudulent means, as alleged. (*Id*.)
7    These allegations stand in contrast to *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 354–
8    55 (8th Cir. 2011), where the plaintiffs merely alleged that various companies and
9    businesses constituted an enterprise "because each of the Defendants identified [in the
10   complaint] was employed by, or associated with, or participated in, such RICO
11   enterprise." *Id*. at 355.

12          Nor are the allegations like *United Food & Commercial Workers Unions &*
13   *Employers Midwest Health Benefits Fund v. Walgreen Co*., 719 F.3d 849 (7th Cir.
14   2013), which concerned two corporations' employees in their individual capacities
15   pursuing separate self-interests in parallel, without any truly joint goals. *Id*. at 854-56.
16   In *Eaves v. Designs for Fin., Inc*., 785 F. Supp. 2d 229 (S.D.N.Y. 2011), cited at Mot.
17   15, the plaintiff literally pled the label, "enterprise," without "any details" and without
18   alleging "an association-in-fact" or supporting facts in any way. *Id*. at 263. In *Mattel,*
19   *Inc. v. MGA Ent., Inc*., 782 F. Supp. 2d 911, 1041 (C.D. Cal. 2011), the link between
20   the enterprise members was limited to their association with Mattel, and the members'
21   roles were separate and unconnected and therefore had no purpose or unity. *Id*. By
22   contrast to these cases, the FAC is full of factual allegations linking Defendants
23   together in a common purpose. (*See, e.g.,* FAC ¶¶ 29, 33, 43-46, 48, 55-61, 71-74, 88,
24   etc.) McGowan has not merely pled facts demonstrating the common interest in
25   laundering Weinstein's reputation in Paragraph 156; her FAC lays out that the scheme
26   existed, how it was formed, by whom, and why. That is sufficient.
27
28

### 5. McGowan properly alleges that the Boies and Bloom Defendants operated or managed the enterprise.

The Boies and Bloom Defendants try to shield themselves from liability by arguing that McGowan failed to allege that they operated or managed the racketeering enterprise because their roles were limited to providing legal services to a client. (Bloom Mot. 14–15; Boies Mot. 15–16.) But just because Boies and Bloom are attorneys does not mean that everything they do for a client constitutes legal services.

The Boies Defendants attempt to recast the allegations as merely that of contracting with an investigative firm on behalf of a client, knowing about a client's legal settlements, meeting with a reporter on a client's behalf, and meeting with the District Attorney's office, which they characterize as "all acts lawyers routinely undertake on behalf of clients." (Boies Mot. 16.) First, it strains credulity that hiring investigative firms to commit crimes in furtherance of stalking journalists, lying to them, and pressuring them to kill negative stories about a client are routine actions that lawyers undertake on behalf of clients. (FAC ¶¶ 33–34.) Second, Boies's argument ignores the bulk of the allegations concerning their activities with respect to the Enterprise, which are far outside the ambit of legal services. McGowan makes very clear in her FAC that the Bloom and Boies Defendants were *not* acting as lawyers or providing legal services when they helped Weinstein orchestrate a scheme to steal McGowan's manuscript, illegally record her, smear her publicly and to news organizations, and seek to discredit her and blunt the impact of her allegations that Weinstein raped her. As to Boies, FAC ¶ 29, (Boies "serves clients in non-legal roles such as reputation management"), ¶¶ 33-34 (Boies provided reputation-management services for Weinstein, seeking to kill negative stories about him), ¶¶ 43-50 (the Boies defendants hired Black Cube "solely to silence WEINSTEIN's accusers and protect WEINSTEIN's reputation"), ¶¶ 117-21 (the contract that the Boies Defendants entered with Black Cube "had nothing to do with litigation or anticipated litigation" and was solely about silencing McGowan, other victims, and journalists); as to Bloom, FAC ¶

14 (Bloom "serves clients in multiple capacities, including in non-legal roles such as reputation management), ¶ 71 (Bloom "pitched her reputation-management services" to Weinstein), ¶ 73 ("As BLOOM requested, WEINSTEIN connected her with DAVID BOIES so that she and THE BLOOM FIRM could get retained to manage WEINSTEIN's reputation), ¶ 105 (Bloom was "intent on stopping any and all public allegations of WEINSTEIN's misdeeds" through the use of spies), ¶ 121 (Bloom personally met with Filip about her covert activities), ¶¶ 135–38 (Bloom's work to discredit McGowan and other victims and kill negative reporting.)

More importantly, it is not as if the Boies and Bloom Defendants just happened to provide professional services to an enterprise that turned out to be engaged in racketeering activity—the FAC alleges that the Boies and Bloom Defendants were instrumental in *directing* that activity, even entering into a contract with Black Cube that spelled out in excruciating detail the Enterprise's objectives. (*Id.*) As to the Bloom Defendants, McGowan specifies that Bloom caused, solicited, and oversaw unlawful and fraudulent recordings, and ratified the results, using them to further the goal of discrediting McGowan, for example to the *New York Times*. The Bloom Defendants acted "knowing and intending that: (a) BLACK CUBE agents would make and did make false representations to MCGOWAN in an effort to...steal her property, intimidate...and deceive...." (*Id.* ¶ 159.) Movants were not bit players or mere office support; they "oversaw and guided BLACK CUBE's work." (*Id.* ¶¶ 160(c), 74.)

The Boies and Bloom Defendants thus cannot avail themselves of cases like *Reves v. Ernst & Young*, 507 U.S. 170 (1993), *Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008), *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993), or *Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*, 832 F. Supp. 585, 591 (E.D.N.Y. 1993), which involved professionals who simply provided accounting and legal services to their clients. While counsel accused of RICO predicates routinely seek to exploit their professional status to escape liability as Bloom and the Boies Defendants do here, "An attorney's license is not an invitation to engage in racketeering, and a

lawyer no less than anyone else is bound by generally applicable legislative enactments. Neither *Reves* nor RICO itself exempts professionals, as a class, from the law's proscriptions…." *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997) (declining to dismiss attorney from RICO suit).

McGowan adequately alleges that the Bloom and Boies Defendants operated or managed the Weinstein-Protection Enterprise.

### 6. McGowan pled the allegations of wire fraud with sufficient particularity as to the Bloom Defendants.

The Bloom Defendants argue that McGowan failed to plead the RICO claim with sufficient particularity. (Bloom Mot. 9–10.) These arguments are again recycled from the prior round of briefing. The Court reviewed these arguments and did not adopt them.

First, and notably, this Court already found that McGowan adequately pled her common-law-fraud claims—allegations that share underlying conduct with the RICO claim—and that she adequately pled vicarious liability. (Opinion at 17–18.) Further, as explained in Section IIA(1)(iv), the Bloom Defendants are liable for their co-schemers' use of wires. *See Stapleton*, 293 F.3d at 1116-18. The Bloom Defendants did not—and cannot—argue that all the wire-fraud allegations are insufficient and not made with requisite particularity. (*See* FAC ¶¶ 43–44, 50, 53–54, 58, 61, 66, 71, 77, 84–87, 88–91, 99, 108–109, 111–114, 116, 123–124, 126, 128, 140–141).[5]

The Bloom Defendants also argue that McGowan failed to plead that they had the requisite intent to deceive or defraud. (Bloom Mot. 9–10.) But McGowan explicitly alleges that "[e]ach Defendant intended to defraud MCGOWAN...knowing and intending that...BLACK CUBE agents would make and did make false representations to MCGOWAN…." *Id*. ¶ 159. Dates, names, times, and places are all provided as cited

---

[5] *Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1169-70 (C.D. Cal. 2016) is therefore distinguishable because the plaintiffs in that case did not allege that the defendants were liable for each other's use of wires based on *Stapleton*.

1   above. Paragraphs 171-72 summarize the fraud, and Paragraph 173 pleads that the
2   Bloom Defendants "knew that [specifically itemized] representations were false when
3   they made them." Contrary to the extremely cursory contention in Bloom's brief on
4   scienter, this list is sufficient, because a party's state of mind "may be alleged
5   generally." Fed. R. Civ. Proc. 9(b); *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir.
6   1995) (no requirement to plead with specificity).

7   **B. McGowan's RICO conspiracy claim stands.**

8   Defendants' argument for dismissing McGowan's RICO conspiracy claim relies
9   on dismissal of her RICO claims. (Boies Mot. 16; Weinstein Mot. 8; Black Cube Mot.
10  12.) Because those arguments fail, McGowan's RICO conspiracy claim must survive.

11  The Bloom Defendants argue that, even if the RICO claim were to survive, the
12  RICO conspiracy claim should be dismissed as McGowan only made "conclusory
13  allegations" that the Defendants agreed to commit the substantive offenses. (Bloom
14  Mot. 15–16.) But beyond the direct allegations in FAC ¶ 167, McGowan details
15  throughout the FAC—and incorporates into the RICO conspiracy count—how Bloom
16  became involved in the enterprise, when, and why she joined, all cited above and all
17  substantiating the plan was intended and mutually agreed. Indeed, McGowan specifies
18  that Bloom oversaw Black Cube's plainly unlawful fraud and attempts to steal from,
19  unlawfully record, and harm McGowan, using the wires to do so. (*Id*. ¶¶ 54, 140(c).)
20  These factual claims adequately describe the knowing and intentional decision to join
21  the enterprise and do far more than "parrot the language" of the statute, as the plaintiff
22  did in *Stewart v. Wachowski*, No. 03-2873, 2005 WL 6184235, at \*14 n. 73 (C.D. Cal.
23  June 14, 2005).

24  **C. McGowan sufficiently pled her Computer Data Access and Fraud**
25  **Act claim.**

26  McGowan's FAC now pleads her CDAFA claims under two different
27  provisions, Sections 502(c)(2) and (c)(7). These sections prohibit "[k]nowingly
28  access[ing] and without permission tak[ing] [or] cop[ying] … any data from a

computer," Section 502(c)(2), and "[k]nowingly and without permission access[ing] or caus[ing] to be accessed any computer," Section 502(c)(7). McGowan has adequately pled this claim based upon Black Cube agents' unauthorized access of McGowan's computer to obtain her unpublished manuscript. In response, Defendants make three arguments. First, they assert that McGowan gave permission to access the information. Next, they argue that McGowan's computer was not "accessed" as defined by California law. Finally, they claim McGowan did not sufficiently allege damages. All of Defendants' arguments for dismissing this claim fail.

### 1. McGowan did not give permission for her computer to be accessed by Black Cube spies.

The Defendants argue that they did not violate the CDAFA because McGowan gave Filip permission to look at her computer. But permission obtained through fraud is no permission at all. Fraud vitiates consent. *People v. Brock*, 143 Cal. App. 4th 1266, 1275–76, 49 Cal. Rptr. 3d 879, 886 (Cal. Ct. App. 2006), *as modified on denial of reh'g* (Nov. 9, 2006). Here, of course, McGowan did not know that Filip and the other Black Cube spy were working at Weinstein's behest. She certainly would not have consented to the encounters with Filip and Laurent had she known their true motivations.

Consent is not effective "if the defendant knew, or probably if he ought to have known in the exercise of reasonable care, that the plaintiff was mistaken as to the nature and quality of the invasion intended." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1073 (9th Cir. 2004) (quoting *Prosser & Keeton* § 18, at 119; cf. Restatement (Second) of Torts §§ 173, 892B(2)). Thus, a "busybody who gets permission to come inside by posing as a meter reader" does not, in fact, have permission, nor does "the police officer who, invited into a home, conceals a recording device for the media." *Theofel*, 359 F.3d at 1073 (citations omitted). In *Theofel*, the Ninth Circuit found that defendants' use of an invalid subpoena to obtain emails from an internet service provider vitiated the plaintiff's consent. *Id*. at 1072-75. Like those situations, Filip and

1 Laurent acted with deception and fraud to gain McGowan's permission. All of those
2 cases—and common sense—make clear that McGowan did not consent to Defendants'
3 access of her computer.

4          **2. McGowan's computer was "accessed" as defined by the**
5             **CDAFA.**

6          Defendants next assert that McGowan's computer was never "accessed" as that
7 term is understood under the statute. This argument requires a strained reading of the
8 term "access." Section 502 defines "access" as "to gain entry to, instruct, cause input
9 to, cause output from, cause data processing with, or communicate with, the logical,
10 arithmetical, or memory function resources of a computer, computer system, or
11 computer network." McGowan's claim is simple. Defendants—through deception and
12 fraud—impermissibly accessed (or, "gain[ed] entry to") McGowan's computer
13 multiple times through Black Cube operatives Filip and Laurent and thereby stole from
14 McGowan much of the contents of the book she was writing. (FAC ¶¶ 198–204.)

15          Defendants suggest that "access" requires some sort of "interaction" between
16 the computer and the person accessing it, and therefore Filip's reading McGowan's
17 manuscript on her computer does not constitute "access." (Black Cube Mot. 13–14;
18 Boies Mot. 17–19; Weinstein Mot. 10.) This argument fails for two reasons. First,
19 McGowan did not just plead that Filip looked at her computer in May 2017. (FAC ¶
20 202.) She also pled that Filip and Laurent accessed her computer and obtained portions
21 of her manuscript during meetings in July and September 2017. (FAC ¶ 204.) Such
22 allegations are not speculative because: 1) Defendants obtained at least half of
23 McGowan's manuscript; 2) they would not have been able to obtain it except from her
24 computer; 3) they would not have been able to obtain the manuscript simply by having
25 Filip look at it; and 4) the meetings between McGowan and Defendants' operatives
26 were the only times Defendants' agents had access to McGowan's computer. (*See* FAC
27 ¶ 119 (The second contact included "achieving the other half of [McGowan's book]'s
28 content.")). It is nonsensical to think that the agents would have been able to use

1  McGowan's computer and copy or otherwise send portions of the manuscript without
2  "interacting" with it. A plain reading of the statute makes clear that Defendants'
3  alleged conduct fits well within it.

4        Second, multiple courts have upheld civil actions in circumstances where, like
5  here, a defendant gained access to a plaintiff's computer and then stole information
6  from it. For instance, in *New Box Sols., LLC v. Davis*, No. CV 18-5324-RSWL-KSX,
7  2018 WL 4562764, at *10 (C.D. Cal. Sept. 18, 2018), one of plaintiff's former
8  employees "fully backed up" his computer "without permission or authorization to do
9  so" and the *New Box Sols.* court found such conduct violative of Section 502.
10 Likewise, in *People v. Hawkins*, 98 Cal. App. 4th 1428 (2002), the defendant without
11 permission made a copy of his employer's proprietary source code and used it to found
12 a competing business. In other words, the defendants in *New Box Sols.* and *Hawkins*
13 stole information on plaintiff's computer to which they were not authorized—just as
14 Defendants did here.

15       The Ninth Circuit previously rejected the Defendants' restrictive reading of
16 "access" in *United States v. Christensen*. There, the Court considered jury instructions
17 involving California Penal Code § 502(c)(2) and concluded that § 502(c)(2) "merely
18 requires knowing access" to a computer. 828 F.3d 763, 789 (9th Cir. 2015). The Court
19 then explained that what "makes that access unlawful is that the person 'without
20 permission'" takes or copies data on the computer. *Id.* In response, defendants in
21 *Christensen* argued—like the Defendants here—that "'access' does not cover mere
22 use of the computer." *Id.* The Ninth Circuit rejected defendants' argument, and held
23 that logging into a database with a valid password and improperly taking, copying, or
24 using information from that database qualifies as "access." *Id.* Importantly, the
25 *Christensen* Court merely found a situation it deemed sufficient to qualify as "access";
26 it did not hold that logging onto a computer or entering a password was necessary to
27 qualify as "access." *Id.* at 790.

28       Neither do the two cases that Defendants rely upon that follow *Christensen* help

their cause. In *Henry Schein, Inc. v. Cook*, a former employee accessed her former employer's computer system to obtain ordering and sales information, which she then copied and made use of without permission. No. 16-CV-03166-JST, 2017 WL 783617, at *5 (N.D. Cal. Mar. 1, 2017). In *Satmodo, LLC v. Whenever Commc'ns, LLC*, access to the plaintiff's computers "by logging onto the search engine website" and "producing invalid clicks on Plaintiff's paid advertisements appearing on search engine pages, which resulted in the redirection of Defendants to Plaintiff's website and servers" plausibly stated "access." No. 17-CV-0192-AJB-NLS, 2017 WL 6327132, at *5 (S.D. Cal. Dec. 8, 2017). While these scenarios are analogous to *Christensen*, they provide further examples of conduct that safely qualifies as "access" under the statute. They do not create a rule of what the accessor must physically do with the computer for it to constitute "access."

Defendants cite *Lateral Link Grp., LLC v. Springut*, where the court declined to find that providing false information to access a consumer website constituted "access" because the court opined that many consumers likely did that and, because it was not clearly criminal conduct, the doctrine of lenity required a reading of the statute that avoided criminalizing that behavior—not because there was insufficient "interaction" between the computer and the person accessing it. No. LACV1405695JAKJEMX, 2015 WL 12778396, at *8 (C.D. Cal. Sept. 22, 2015). Here, of course, Filip *did* violate a criminal statute by fraudulently representing her identity to obtain McGowan's book, (California Penal Code 532), and others accessed McGowan's computer without her permission when she left the room. Neither is common conduct that would warrant applying the lenity observed by the *Springut* court. Defendants also cite *Facebook, Inc. v. Power Ventures, Inc*., No. C 08-05780 JW, 2010 WL 3291750, at *7 (N.D. Cal. July 20, 2010), and *New Box Sols., LLC v. Davis*, No. CV 18-5324-RSWL-KSX, 2018 WL 4562764, at *10 (C.D. Cal. Sept. 18, 2018), but those cases examine the term "without permission," not the term "access," and therefore are inapplicable and do not support Defendants' contrived "interaction" rule.

Indeed, Defendants' "interaction" argument would lead to absurd results. For instance, in *Christensen*, the Ninth Circuit found that "access" included logging into a database with a valid password and subsequently taking, copying, or using information from that database improperly. 828 F.3d at 788–89. Using Defendants' logic, tricking someone else into logging on to a computer and then improperly using that information would not constitute "access" because someone else "interacted" with the computer. Imagine someone impersonating a Google employee to access a Google office building, then reading visible sensitive information on Google employees' computers and misusing that information. Such conduct would clearly violate the CDAFA, because (like here) the person is still accessing information that is on another person's computer without permission, because it was done through fraud. Therefore, McGowan properly pled "access."

Even if the Court were to find that McGowan's allegations did not amount to "access," McGowan's CDAFA claim survives for a wholly independent reason and for a basis that all Defendants ignore: under Section (c)(7), a defendant is liable for "caus[ing] [a computer] to be accessed," which clearly does not require the defendant to physically interact with the computer. *See COR Sec. Holdings Inc v. Banc of California, N.A.*, No. SACV171403DOCJCGX, 2018 WL 4860032, at *6 (C.D. Cal. Feb. 12, 2018) (holding that, because § 502(c)(7) does not require that the defendant personally access a computer, a defendant instructing another individual to access documents on a computer without permission "cause[d] [a computer] to be access[ed]" without permission).

Defendants also try to argue that McGowan is improperly applying the CDAFA extraterritorially because one instance where Filip likely accessed McGowan's computer took place in New York. (Boies Mot. 19; Bloom Mot. 20.) "Unless the legislature explicitly indicates otherwise, if the liability-creating conduct occurs outside of California, California law generally should not govern that conduct." *Terpin v. AT&T Mobility, LLC*, 399 F. Supp. 3d 1035, 1047 (C.D. Cal. 2019) (internal

quotations omitted). Here, the California legislature *did* explicitly permit extraterritorial application in Section 502(j). The FAC alleges that all Defendants regularly conduct business in California, (*see* FAC ¶¶ 11–16), so by causing the woman posing as Diana Filip to access McGowan's computer, Defendants are deemed to have accessed McGowan's computer in California.

The Defendants next try to argue that McGowan did not plead these allegations with the requisite specificity. (Boies Mot. 19; Weinstein Mot. 11; Bloom Mot. 20.) "In cases where fraud is not a necessary element of a claim, … [a] plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003). "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). "[Rule 9(b)] may be relaxed as to matters within the opposing party's knowledge" such as, in *Moore*, allegations of corporate fraud. *Id.*

McGowan has adequately pled the circumstances constituting the fraud—Filip accessed McGowan's computer on May 13, 2017 by lying about her identity. (FAC ¶ 202.) In July and September 2017, Defendants' agents had the opportunity to access McGowan's computer again when Filip and Laurent—while lying about their identities—met with McGowan. (FAC ¶¶ 203–04.) Given that Defendants were successful in accessing at least half of her manuscript, and Defendants could only have obtained the manuscript from McGowan's computer, Defendants must have accessed her computer to take the manuscript during at least one of these occasions. This more than adequately alleges the "circumstances constituting the fraud." Furthermore, this is precisely the type of situation where the specific facts surrounding the fraud are within the opposing party's knowledge. Indeed, the cases that the Bloom Defendants

themselves cite involve similar pleadings that the courts found adequate, especially under the circumstances. *See Craigslist, Inc. v. Mesiab,* No. C 08-05064 CW (MEJ), 2009 WL 10710286, at *10 (N.D. Cal. Sept. 14, 2009), *report and recommendation adopted*, No. 08-05064 CW, 2009 WL 10710276 (N.D. Cal. Oct. 19, 2009); *Williams v. Facebook, Inc*., No. 18-CV-01881-RS, 2019 WL 11794250, at *7 (N.D. Cal. Aug. 29, 2019).

### 3. McGowan adequately pled that she was injured because her computer was unlawfully accessed.

Defendants argue that McGowan's damages and loss from the CDAFA violation are not actionable under the statute's civil-remedy provision because they claim that only losses "rooted in the costs of investigating and remedying a computer intrusion" are recoverable. (Black Cube Mot. 14–16; Bloom Mot. 20.) But nowhere in the CDAFA are damages so limited.

While the law makes clear that plaintiffs' damages can include compensation for the costs to verify that a computer was not altered, damaged, or otherwise harmed by a defendant's conduct, *see* § 502(e)(1), the statute does not limit damages to just that narrow relief. In fact, section 502(e)(1) gives a private plaintiff like McGowan the right to "bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." Section 502(e)(1) adds that "compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner . . . to verify that a computer system . . . was not altered, damaged, or deleted by the access." As this Court held in *Ticketmaster, LLC v. Prestige Entertainment West, Inc.*, 315 F. Supp.3d 1147, 1173 (C.D. Cal. 2018), use of the word "including" in a statute "indicates that this list is not exhaustive." Other courts have recognized that damages under CDAFA are not narrowly limited to the costs of investigating and remedying a computer intrusion. *See, e.g., Williams v. Facebook, Inc*., 364 F. Supp. 3d 1043, 1050 (N.D. Cal. 2018) (recognizing that damages under CDAFA include "a showing of economic harm or loss" and can include diminishment in value of the

accessed information). While a case cited by defendant—*Mintz v. Mark Bartelstein and Assoc. Inc.*, 906 F.Supp.2d 1017, 1031-32 (C.D. Cal. 2012)—observed that a plaintiff who pled that he spent time restoring his password and investigating an incident pled sufficient damage under the statute, the *Mintz* Court said nothing about restricting damage to such categories, specifically stating instead that *any* amount of damage or loss is sufficient.

Defendants also argue that McGowan's losses are too vague and distant to have been proximately caused by the CDAFA violation. (Black Cube Mot. 14–16; Bloom Mot. 20.) Defendants cite to *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 949–51 (N.D. Cal. 2014), but that case is clearly distinguishable. In *NovelPoster*, the plaintiff merely pled that it "has suffered damages and/or loss in excess of $5,000 in the year preceding the date of this filing, but the damages grow each day that Defendants refuse to acknowledge termination of the Agreement." *Id*. The court properly found that assessment "entirely speculative" because it was "devoid of any specific details from which a factfinder could calculate an amount of loss." *Id*. That is not the case here. Despite Defendants' arguments to the contrary, McGowan *did* plead that Defendants discredited and maligned her publicly, undermining her book, commercial projects, and reputation. (*See, e.g.,* FAC ¶¶ 148–49; *see also* ¶ 206.) This is sufficient at this stage of litigation, especially in circumstances here where details of the fraud are within Defendants' knowledge. *See Moore*, 885 F.2d at 540. Further, this allegation provides far more detail as to the kinds of losses suffered and their causal link to Defendants' unlawful access than did *NovelPoster* and *Capitol Audio Access, Inc. v. Umemoto*, 980 F. Supp. 2d 1154, 1160 (E.D. Cal. 2013), where the court found that damages had been sufficiently pled when the plaintiff simply alleged that it "has been injured by [Defendant's] violations of the [CCDAFA]."

McGowan properly pled damages from Defendants' CDAFA violation.

**D. McGowan's Intentional Infliction of Emotional Distress ("IIED") claim is colorable.**

**1. McGowan brought her IIED claim well within the statute of limitations.**

New paragraphs of the FAC clarify when and how McGowan discovered the conduct underlying her IIED claim, and why it was not possible for her to have discovered this information earlier despite reasonable diligence.

Defendants try to argue that the moment McGowan might have had a suspicion about *non-tortious* activity among and between the Defendants, the statute of limitations period began to run. But that is simply not the law. The discovery rule tolls the statute of limitations until the plaintiff suspects "elements *of a cause of action*," i.e. of a tort, and that suspicion is "*coupled with knowledge of any remaining elements*" of the tort. *Fox v. Ethicon Endo-Surgery, Inc*., 110 P.3d 914, 920 (Cal. 2005) (emphasis added).

**a. The Bloom Defendants must be analyzed distinctly from all other parties; the FAC makes clear that McGowan discovered Bloom's role in this matter very shortly before filing suit, well within the statute of limitations.**

This case was filed in 2019. Unlike some of the claims against other Defendants, McGowan discovered Bloom's specific unlawful conduct just months earlier, in 2019. (FAC ¶¶ 144-46.) Her claims against Bloom are plainly timely and warrant a different analysis than the other Defendants.

The FAC details that McGowan learned of various Defendants' wrongdoing in late 2017.  In October 2017, Bloom also publicly disclosed some form of acquaintance with Weinstein when she claimed she had advised Weinstein not to attack women. (FAC ¶ 144.) In the same disclosure, however, Bloom insisted (falsely) that she had **no role** in "digging up dirt" on Weinstein's accusers. *Id.* The FAC is clear that McGowan "did not learn" of details about Bloom's tortious acts from this or any other source in 2017.  *Id.* It goes on to explain why: Bloom's statement about her involvement was untrue; the truth would not become public until 2019, unlike facts

1  that came to light about other Defendants in 2017; and Bloom was a known advocate

2  for sex harassment victims—thus her role engaging in torts for a wildly prolific abuser

3  of women was not exactly consistent with the image she projected. Moreover, the

4  means of targeting McGowan were by design surreptitious and fraudulent.  (FAC ¶

5  144-46.)

6         Despite these clear pleadings, the Bloom Defendants argue that McGowan

7  should have made the magical mental leaps that Bloom in 2017 was not only lying

8  about "digging up dirt," but was doing so *as to* McGowan, *and* furthermore was doing

9  that unlawfully, by actively guiding spies to infiltrate her life under false pretenses.

10  (Bloom Mot. 21.) They further argue that, because a third party in the *publishing*

11  industry contacted McGowan, ostensibly on behalf of Bloom to convince McGowan

12  that Weinstein was a "changed man," McGowan should have known that Bloom was

13  working with Weinstein—and then further leaped to the conclusion that surely that

14  work included covert use of spies to defraud, manipulate, and steal from her. This

15  Court cannot simply *infer* outlandish surmises of this sort; it certainly does not follow

16  from the FAC and is not favorable to the nonmovant, as required in this procedural

17  position. In fact, Bloom's argument is outright contrary to the plain FAC allegations

18  this Court is bound to accept.

19         The discovery rule is not triggered when a plaintiff merely knows a person is in

20  any way acquainted or aligned with a tortfeasor. Rather, it is triggered and a statute of

21  limitations begins to run when a plaintiff "knew or should have known of the *wrongful*

22  *conduct at issue*" as to the defendant claiming the defense. *El Pollo Loco, Inc. v.*

23  *Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003); *Fox*, 110 P.3d at 920 (touchstone is

24  when the plaintiff knows of elements "*of a cause of action, coupled with knowledge of*

25  *any remaining elements*, will generally trigger the statute of limitations period.")

26  (emphasis added to both citations). In application, the rule means here that the statute

27  began running when McGowan knew or should have known that Bloom was working

28  to steal her manuscript, prevent its publication, and smear and discredit her through

1   the use of an international spy agency.

2       Bloom does not and cannot support any legal precedent for the argument she

3   advances here.  The IIED claim as to the Bloom Defendants is timely. Even if there

4   were a question as to this conclusion, the question whether a plaintiff knew or should

5   have known about a cause of action is a question of fact for a jury. *Apr. Enterprises,*

6   *Inc. v. KTTV*, 195 Cal. Rptr. 421, 437 (Cal. Ct. App. 1983).

7
              **b.    McGowan first discovered the facts that ground her**
8                    **IIED claim as to the remaining Defendants in November**
                     **2017; those claims are timely.**
9

10      McGowan also adequately pled the time and manner of discovering the conduct

11  that forms the basis of her IIED claim against the Weinstein, Black Cube, and Boies

12  Defendants. FAC Paragraphs 142 and 143 explain the discovery of facts as to

13  Weinstein, Black Cube, and the Boies Defendants, and Paragraph 145 explains why

14  McGowan could not have discovered these facts before that time despite reasonable

15  diligence. Defendants Weinstein, Black Cube, and Boies try to argue that these new

16  detailed allegations are still not sufficient because finding out Filip's identity and

17  discovering that McGowan was recorded are only a small part of her IIED claim and

18  because knowledge of a defendant's identity is not a part of the discovery rule. (Black

19  Cube Mot. 17–18; Boies Mot. 21; Bloom Mot. 21; Weinstein Mot. 11–13.) But finding

20  out that Filip was in fact a Black Cube agent hired by Weinstein was the pivotal

21  foundation of the entire scheme. This is not a situation of knowing a tort has occurred

22  and needing to identify the defendant responsible. *Cf. Norgart v. Upjohn Co.*, 21 Cal.

23  4th 383, 399, 981 P.2d 79 (Cal. 1999). This was a meaningfully distinct situation of

24  not knowing anything tortious had occurred – and then, by learning the truth of an

25  identity, for the first time learning the fraud existed at all.

26      Paragraph 145 explains how McGowan could not have discovered this

27  information prior to November 2017. The Black Cube Defendants argue that

28  McGowan did have reason to suspect what was going on prior to November 2017

1  because Bloom—via Lynch—reached out to McGowan to convince her that Weinstein
2  was a "changed man" and because McGowan was approached by an attorney who
3  offered her money in exchange for dropping the book and entering into a non-
4  disclosure agreement with Weinstein. (Black Cube Mot. 18.) But suspecting that
5  Bloom might be supporting or working with Weinstein or that Weinstein did not want
6  her to publish her book did not supply McGowan with knowledge of the facts that
7  form the basis of her claim—that Weinstein and others employed spies to lie to,
8  defraud, and manipulate her, steal her manuscript, unlawfully record her, and malign
9  her to reporters. Bloom's trying to convince McGowan that Weinstein had changed is
10 not outrageous or offensive conduct. Nor is Weinstein's trying to enter into a non-
11 disclosure agreement. McGowan needed knowledge of facts that would have given her
12 knowledge of the elements of her claim. *See Fox*, 110 P.3d at 920.

13      As argued above, this Court is not permitted in this procedural posture to infer,
14 despite allegations to the contrary, that McGowan knew about the scheme earlier,
15 because a random reporter, Ronan Farrow, knew more. (Black Cube Mot. 18.) There
16 is no standard in the law that if the *New York Times*' professionally trained and
17 experienced investigative reporters, with ample funding and time (not to mention the
18 reporters' privilege to protect sources and status) can discover a wrong, then that
19 establishes as a matter of law that a thoroughly deceived and defrauded victim knew
20 or should have known equally as much. Taking the complaint as true, the timeliness
21 arguments fail.  But even if they leave a question for this Court, whether a plaintiff
22 knew or should have known about a cause of action is a question of fact for a jury.
23 *Apr. Enterprises, Inc.*, 195 Cal. Rptr. at 437.

24          **2.  McGowan pleads "extreme and outrageous" conduct.**

25      Defendants then argue that McGowan's IIED claim fails because lying does not
26 support an IIED claim. But the cases they cite for this contrived rule support no such
27 thing and are clearly distinguishable from the present case. In *McMahon v. Craig*, a
28 veterinarian lied to a dog's owner about feeding his dog as well as the manner of his

1   dog's death. 97 Cal. Rptr. 3d 555, 566 (Cal. Ct. App. 2009), *as modified on denial of*

2   *reh'g* (Aug. 31, 2009). The court dismissed the IIED claim not because lies never

3   support an IIED allegation, as Defendants suggest.  Rather, it ruled as it did because

4   the plaintiff was not a bystander to his dog's death, nor was he a direct victim because,

5   despite the plaintiff's argument to the contrary, the relationship between the plaintiff

6   and his dog's veterinarian was not akin to a physician-patient relationship. *Id*.

7        Black Cube then argues that because the deceptive conduct was done in the

8   context of an undercover investigation it cannot form the basis of an IIED claim. In

9   support Black Cube cites non-California law, though California law holds, "the hirer

10  of a detective agency for either a single investigation or for the protection of property,

11  may be liable for the intentional torts of employees of the private detective agency

12  committed in the course of employment." *See Noble v. Sears, Roebuck & Co.*, 33 Cal.

13  App. 3d 654, 663 (1973).

14       In any case, Black Cube was not conducting an "undercover investigation," as

15  that term has been used in the extra-jurisdictional case law. For example, in *Ouderkirk*

16  *v. People for Ethical Treatment of Animals, Inc*., No. 05 10111, 2007 WL 1035093, at

17  *23 (E.D. Mich. Mar. 29, 2007) PETA members expressed genuine interest in buying

18  a chinchilla ranch, then later publicized the ranch's practices. The court in *Ouderkirk*

19  dismissed the plaintiff's IIED claim on summary judgment, after it found no unlawful

20  means or methods were used and no other tort was established.  Utterly contrary to the

21  facts here, it ruled on the fully-developed record that the investigation had been part

22  of a tradition of investigating "to reveal improper, unethical, or criminal behavior." *Id*.

23  (internal quotations and citation omitted). Here, Black Cube was *not* investigating

24  anything to reveal wrongdoing, let alone for greater societal good—nor could this

25  Court infer as much in this procedural posture. The FAC alleges they lied to obtain

26  access to steal what they wanted. No case anywhere holds such conduct exempt from

27  IIED liability.  The case is also far from the situation in *Creel v. I.C.E. & Assocs., Inc*.,

28  771 N.E.2d 1276, 1278 (Ind. Ct. App. 2002). There, as in *Ouderkirk*, defendants were

1  trying to expose wrongdoing, and to do so they videotaped the plaintiff's public actions
2  carried out in front of a crowd of 140 people. *Id*. The level of covert manipulation and
3  invasion into the privacy and confidence of a target—as well as the nefarious purpose
4  solely for individual gain—clearly distinguish this case from those cited by Black
5  Cube.

6       Defendants also try to argue that it was not their conduct, but the discovery of
7  the conduct that actually caused Plaintiff distress. Because Defendants never intended
8  that she find out about their scheme, they argue, they cannot be liable. Defendants
9  certainly win some creativity points for this argument, but it does not defeat
10 McGowan's claim. Indeed, Defendants' argument would write any IIED involving
11 fraud, deception, embezzlement or similar conduct out of the common law. No case
12 countenances this result. In any case, McGowan pled that Defendants' manipulation,
13 abuse of trust, maligning, and theft caused her damages—not her discovery of the
14 truth. (FAC ¶¶ 209–19.) At this stage, her allegations must be accepted as true. *Bell*
15 *Atlantic Corp. v. Twombly*, 550 U.S 544, 555 (2007).

16      The Bloom Defendants assert that McGowan's claim as to Bloom is not
17 outrageous conduct, primarily by mischaracterizing the pleadings. (Bloom Mot. 21–
18 22.) The Bloom Defendants argue McGowan has sued solely based on Bloom
19 "put[ting] on a friendly face" to McGowan, and they assert that "putting on a friendly
20 face" is not outrageous conduct. (Bloom Mot. 22.) *Yau v. Santa Margarita Ford, Inc*.,
21 176 Cal. Rptr. 3d 824, 836 (Cal. Ct. App. 2014), is cited in support of that assertion,
22 but it says no such thing. The court in *Yau* dismissed the plaintiff's IIED claim because
23 it was barred by California's workers' compensation act. *Id*. In any event, McGowan's
24 IIED claim as to Bloom is not merely that she "put on a friendly face" to McGowan.
25 As explained below in Section IIG, Bloom is liable through principles of agency for
26 all of the acts of Black Cube. Indeed, this Court already found that McGowan
27 "sufficiently alleges a plausible theory under which the Bloom Defendants, the Boies
28 Defendants, and Weinstein are vicariously liable for the fraud perpetrated by Black

Cube's agents." (Opinion at 17.) The factual allegations that the Court examined in reaching that conclusion are very similar to the factual allegations that underlie the IIED claim and similarly adequately plead that the Bloom Defendants are vicariously liable for Black Cube's conduct with respect to McGowan's IIED claim. (*See, e.g.,* FAC ¶¶ 73, 74, 82, 88, 92, 97, 117, 121, 130, 137, 138). There is no reason for the Court to not similarly find that McGowan adequately pled vicariously liability for her IIED claim.

The Bloom Defendants also try to argue that because there was no direct contact between Bloom and McGowan, McGowan cannot demonstrate intent to harm and causation between the conduct and damages. But that a defendant "met or communicated with" the plaintiff is not an element of an IIED claim. *Cf. Armstrong v. Shirvell*, 596 F. App'x 433, 452 (6th Cir. 2015) (upholding verdict for intentional infliction of emotional distress where defendant stalked and blogged about plaintiff, but the two never met). This Court cannot dismiss a claim because the plaintiff does not plead an unnecessary element. Intent, causation, and damages are also clearly pled. (FAC ¶¶ 209–219.)

Finally, whether conduct is extreme or outrageous is a question of fact for a jury. *See, e.g., Bundren v. Superior Court of Ventura Co*., 145 Cal.App.3d 784, 792, 193 Cal.Rptr. 671 (1983) (holding questions of unreasonableness and outrageousness are more appropriately decided by a trier of fact hearing live testimony than on summary judgment); *Trerice v. Blue Cross of California*, 209 Cal. App. 3d 878, 883, 257 Cal. Rptr. 338, 340 (Ct. App. 1989) ("the outrageousness of a defendant's conduct normally presents an issue of fact to be determined by the trier of fact"). If shooting a plaintiff's pet, *Gregory v. City of Vallejo*, 63 F. Supp. 3d 1171, 1182 (E.D. Cal. 2014); an employee publicly circulating information about another employee's medical condition; *William S. v. Lassen Cty*., No. CIVS051217DFLCMK, 2007 WL 1651243, at *3 (E.D. Cal. June 5, 2007); and a supervisor treating an employee with an anxiety disorder differently from other employees, *Martinez v. Costco Wholesale Corp*., 481

1    F. Supp. 3d 1076, 1103 (S.D. Cal. 2020); are all sufficient to state an IIED claim, then

2    allegations that a group of high-powered attorneys, a renowned cinematic director, and

3    an international spy agency worked together to send spies to manipulate and trick a

4    person that the director sexually assaulted into divulging information that this group

5    of people then used to try to silence and discredit her, surely is sufficient. Plaintiff's

6    IIED claims stand.

7          **E. McGowan's negligent hiring and supervision claim against the Boies**

8             **and Bloom Defendants is sufficiently pled.**

9               **1. McGowan sufficiently pled negligent hiring and supervision as**

10                 **to the Boies Defendants.**

11      The Boies Defendants argue that McGowan failed to properly plead her

12    negligent-hiring-and-supervision claim because she failed to properly plead that the

13    Defendants knew about the risk of harm to McGowan, and because there is an

14    insufficient nexus because the risk of harm and the harm caused. (Boies Mot. 21–23.)

15      As to the Boies Defendants, McGowan specifically alleges that: (1) the Boies

16    Defendants had worked with Black Cube before on other matters, FAC ¶ 225; (2)

17    Black Cube was widely known to use former intelligence operatives who would use

18    illicit tools to achieve nefarious objectives, and there were public reports that Black

19    Cube was under investigation and even facing criminal charges for using illegal

20    methods, *id*. ¶¶ 47, 229; (3) the contracts the Boies Defendants signed explicitly

21    commissioned the use of questionable tactics like obtaining recordings, procuring

22    confidential intellectual property, and requiring payment of exorbitant fees and

23    bonuses for obtaining confidential property, *id*. ¶¶ 48–49, 111, 118–19, 226; and (4)

24    even the most basic update about Black Cube's activities would have included

25    information that Black Cube was using a female agent—expressly given a pseudonym

26    "Anna" in the very contract Boies signed—who assumed a fraudulent identity and was

27    illegally recording discussions with McGowan, *id*. ¶¶ 118, 228. Taken together—their

28    prior experience with Black Cube, Black Cube's reputation, and the contract that

1    explicitly sanctions the use of questionable tactics—this is sufficient at this stage of
2    the proceedings to plead that the Boies Defendants knew about the risk of harm in
3    hiring Black Cube.

4        Indeed, under the case the Boies Defendants cite, those facts amply support a
5    negligent-hiring-and-supervision claim. *See Phillips v. TLC Plumbing, Inc*., 172 Cal.
6    App. 4th 1133, 1139-40 (2009) (negligence liability imposed when employer knew or
7    should have known that hiring employee created particular risk and that particular
8    harm materializes). And *Phillips* does nothing to defeat McGowan's claim. *Phillips*
9    concerned a *former* employee of the defendants who killed a woman he had met while
10   working for the defendants, some *two years after* the defendants had fired him. *Id*.
11   Here, by contrast, Black Cube did exactly what the Defendants hired it to do, acting
12   within the scope of its employment in doing so. The purpose of the employment was
13   to target the victim/Plaintiff. *Federico v. Superior Ct. (Jenry G.)* is similarly
14   unavailing. 69 Cal. Rptr. 2d 370, 374 (Cal. Ct. App. 1997), *as modified on denial of*
15   *reh'g* (Dec. 8, 1997). That case was in a summary-judgment posture and concerned
16   whether an employee's convictions for sexually molesting youths alerted the employer
17   of a risk to the public generally of employing that individual at a hair salon. *Id*. Unlike
18   in *Federico*, the parties here have not yet conducted discovery. Further, this case does
19   not involve the mere potential for harm arising from hiring someone with a criminal
20   background. As clearly pled, Black Cube was explicitly hired to target McGowan.
21   Moreover, it was widely known—and would have especially been so with savvy high-
22   powered attorneys like the Boies and Bloom Defendants—that Black Cube used illicit
23   tools to achieve the objectives *they were hired to do*.

24       The Boies Defendants next argue that McGowan fails to identify harm that they
25   should have been on guard for that later materialized. McGowan does identify such
26   harm, in detail. She pleads that the Boies Defendants knew that Black Cube agents
27   would spy on, lie to, and surreptitiously record McGowan, and try to obtain her
28   confidential unpublished manuscript. (FAC ¶¶ 226, 228.) She pleads, too, that the

Boies Defendants knew that the engagement's objective was to kill news stories revealing Weinstein as a rapist and discredit McGowan and other Weinstein victims. (FAC ¶ 229.) These harms actually materialized, causing McGowan concrete economic losses and emotional injuries. McGowan expressly pleads that the Boies Defendants' actions were critical in causing the damages because Weinstein "was very powerful, but he could not and did not act on his own. He relied on representatives like [the Boies Defendants] to carry out key strategies to protect him." (FAC ¶ 231.)

The Boies Defendants also argue that California requires a "close nexus" between the identifiable risk of harm a hire poses and the harm caused—and that McGowan has failed to meet this standard. But the case they cite does not support this alleged "heightened" nexus standard. In *Doe v. Cap. Cities*, the plaintiff was drugged and gang raped by a director while the plaintiff was unconscious. 50 Cal.App.4th 1038, 1043, 58 Cal.Rptr.2d 122 (Cal. Ct. App. 1996). The court dismissed the negligent-hiring-and-supervision claim because, while defendant allegedly knew the director took drugs, that does not mean defendant knew the director would drug other people without their consent. *Id.* And that while defendant knew that this director may have used his position to "gain" sexual favors, that suggests knowledge of a *quid pro quo* situation, not forcible rape while the person is unconscious. *Id.*

Here, both Bloom and Boies are savvy lawyers. (FAC ¶¶ 225-31). The FAC alleges that Boies knew about Black Cube's tactics and that it was well known that Black Cube used illicit techniques. (FAC ¶ 225.) The contracts on their faces adopted questionable tactics like obtaining nonconsensual recordings, obtaining confidential IP, and employing someone using only an alias. They also promised high fees and bonuses that would not reasonably be paid absent special risk. These features tipped the Defendants—or, at the very least, should have—to the danger that Black Cube would engage in fraud, deception, and theft to harm McGowan. (FAC ¶ 226) The *factual dispute* that they might not have understood the risks associated with employing Black Cube is not appropriate to resolve in this procedural posture.  This

1   Court must draw the favorable inference that risk was clear where the engagement's
2   goals were spelled out in black and white in contracts the Boies defendants signed. Put
3   differently, McGowan essentially alleges that the Boies Defendants chose Black Cube
4   because Black Cube used illegal tactics more mainstream consultants would not. This
5   is sufficient to survive a motion to dismiss.

### 2. McGowan sufficiently pled negligent hiring and supervision as to the Bloom Defendants.

8        As attempted above, the Bloom Defendants argue that the statute of limitations
9   has run on this claim because McGowan knew in 2017 that Bloom made overtures to
10  reach McGowan while working for Weinstein. But, as explained in Section IID(1), the
11  discovery rule requires more than a mere suspicion about individuals generically
12  associating with one another; it requires knowledge of the facts that underlie an actual
13  tort. McGowan specifically pleads in FAC Paragraphs 142-46 and 232 when and how
14  she discovered the underlying conduct as to Bloom in 2019, and why she could not
15  have reasonably discovered that information sooner. All of the claims in this matter
16  are timely, but the Bloom claims are the easiest case, having been discovered very
17  shortly before filing on a different timeline than applies to the other Defendants.

18       The Bloom Defendants also argue that McGowan, who was recently denied the
19  opportunity to begin discovery, "offers no support" for the assertion that Bloom hired
20  or supervised Black Cube. This is not a summary judgment motion, and it is not
21  McGowan's burden to prove this claim without discovery. She has pled that the spy
22  inserted in McGowan's life, "acted as...BLOOM's, and THE BLOOM FIRM's
23  authorized agent." (FAC ¶ 92.) Bloom personally met with Filip, *id.* ¶ 121, and "guided
24  BLACK CUBE's work." *Id.* ¶ 160(c). Boies was not directing the work alone, "BLOOM
25  and the BLOOM FIRM joined BOIES...in overseeing BLACK CUBE's work." *Id*. ¶
26  74. This amply pleads supervision. "Agency allegations are subject to general pleading
27  requirements…." *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1112
28  (2009), as modified on denial of reh'g (Feb. 3, 2009) (reversing trial court for dismissal

1  on pleadings).

2      Bloom adds, "notably," she did not sign the contract with Black Cube.  (Bloom

3  Mot. 23). However, that is neither notable, nor controlling: California law allows for

4  liability on this tort concerning a simple agency: "where the principal is either

5  negligent or reckless in the hiring or supervision of the agent." *Deutsch v. Masonic*

6  *Homes of California, Inc.*, 164 Cal. App. 4th 748, 783 (2008) (approving instruction

7  on this tort as to employees and other agents). Bloom's own cited case, *Phillips v. TLC*

8  *Plumbing, Inc.*, 172 Cal. App. 4th 1133 (2009), agrees, stating, "A person conducting an

9  activity through servants or other agents is subject to liability for harm resulting from

10 his conduct if he is negligent or reckless." *Id.* at 1139. *Phillips* was only dismissed

11 because an employment relationship between the defendant-employer and the wrongdoer

12 had ended entirely, two years before the wrongdoer harmed the plaintiff. *Id.* at 1136-37.

13 Those facts are not present here.

14     Next, Bloom claims she could not have known about the risk of harm to

15 McGowan because the contract (which Bloom argues a few lines earlier she was not a

16 party to) said Black Cube would use lawful methods. While the FAC indeed alleges

17 the Black Cube contract said so—and while Plaintiff endorses taking the FAC as true

18 for purposes of this motion—Bloom has not kept reading.  After all, the FAC also

19 alleges that Black Cube in fact failed to act lawfully, and Bloom knew it. The

20 Paragraphs cited above reflecting on Bloom's supervision allege Bloom accepted the

21 fruits of and ratified Filips' fraudulent conduct.  McGowan further pled that the Bloom

22 Defendants are sophisticated, savvy lawyers and that it was well known that Black

23 Cube used illicit means to conduct its business. (FAC ¶¶ 225-31). Plaintiff's

24 allegations are adequate at this stage in the proceedings.

25     Next, Bloom argues that McGowan has failed to plead proximate causation of

26 harm. However, the FAC alleges that Defendants "were the proximate cause of"

27 McGowan's emotional distress, (FAC ¶ 219, 231), and provides exhaustive detail

28 supporting that allegation. Moreover, Section II A(3) above further explains where the

1  FAC pleads Defendants proximately caused McGowan concrete economic harm.

2  **F. McGowan properly pled her invasion-of-privacy claim against the**
3  **Bloom Defendants.**

4  The Bloom Defendants next argue that McGowan's invasion-of-privacy claim
5  fails because it is untimely and because she failed to allege the claim's elements.

6  The claim is timely. The statute of limitations for invasion-of-privacy claims is
7  two years. *See* Cal.Code Civ. Proc. § 335.1; *Quan v. Smithkline Beecham Corp*., 149
8  F. App'x 668, 670 (9th Cir. 2005). McGowan pleads in Paragraph 194 that she first
9  learned of Bloom's actions that formed the basis of this claim in September 2019. The
10  Bloom Defendants make much to do about the fact that a publisher, Lacy Lynch,
11  reached out to McGowan in March 2017 about Bloom wanting to speak to McGowan
12  about how Weinstein had changed. This argument is answered above. Knowing
13  someone called to give an opinion of something is far, far short of establishing
14  knowledge of specific tortious conduct.

15  Next, the Bloom Defendants rehash arguments from prior briefing that because
16  McGowan allowed Filip to read her book on her computer and because she ultimately
17  published her book, she cannot make out an invasion-of-privacy claim. This ignores
18  the FAC pleadings that Filip and other Black Cube agents accessed McGowan's
19  computer without her permission. (FAC ¶¶ 122, 129.) On this basis alone, the tort
20  could proceed. The case Bloom cites, *Hill v. NCAA*, 7 Cal. 4th 1 (1994), does not assist
21  Bloom; rather, it establishes that the touchstone for liability is the offensiveness of the
22  defendant's invasion. Thus, even in the face of apparent consent an intrusion could still
23  "be deemed highly offensive to a reasonable person so as to justify tort liability," even if
24  such facts would be rare. *Id.* at 26; *see also id.* at 3 (laying out the fact-intensive
25  components of offensiveness, including "the degree of the intrusion, the context, conduct,
26  and circumstances surrounding the intrusion…the expectations of those whose privacy is
27  invaded."). The Bloom movants have not and cannot show in this procedural posture lack
28  of offensiveness according to these factors as a matter of law.

Even more fundamentally, any "consent" relied upon must be McGowan's "consent" to speak to Filip – that is, consent achieved under false pretenses as to Filip's intentions and identity. *See* FAC ¶ 145 (explaining McGowan reposed trust in Filip due to false assurances). Bloom does not even try to argue this is true "consent" as a matter of law. It is not. Where a person is "induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm." *See* Rest. (2d) of Torts § 892B (1979); *see also Sanchez–Scott v. Alza Pharm.,* 86 Cal. App. 4th 365, 377-78 (2001) (sustaining patient's privacy claim where doctor obtained "consent" for an examination in front of a drug salesperson, but did not disclose the salesperson's role).

The Bloom Defendants cannot support their argument that McGowan's privacy was not invaded when her unpublished manuscript was stolen and shared with her rapist. *See, e.g., Opperman v. Path, Inc.,* 87 F. Supp. 3d 1018, 1059 (N.D. Cal. 2014) (recognizing a colorable expectation of privacy in electronic devices and files). Defendants cite *Gill v. Hearst Pub. Co.*, 40 Cal. 2d 224, 231, 253 P.2d 441 (1953), to support this argument. But *Gill* involved the publication of a photograph taken in a public place—i.e., it involved sharing something that was *already public*. *Id*. Here, McGowan's book was *not published* at the time her manuscript was stolen. Further, McGowan's manuscript divulged personal information, and Defendants caused that manuscript to be stolen and shared with her rapist, Weinstein. Whether conduct is highly offensive to a reasonable person is a question of fact. *See Alejandre v. Gen. Elec. Co.*, No. CV 12-1304-CBM-JEM, 2013 WL 12119718, at *3 (C.D. Cal. Feb. 20, 2013). It is not for Bloom to say this conduct did not invade McGowan's privacy; it is for a jury to decide.

**G. The Bloom Defendants are vicariously liable through agency liability.**

The Bloom Defendants try to argue that they are not vicariously liable for Black Cube's conduct as to Counts V (invasion of privacy), VI (CDAFA), and VII (IIED).

However, this Court already specifically rejected this argument in finding that McGowan adequately alleged agency theory for her state-law fraud claims. (Opinion at 17-18.) The Bloom Defendants try to wiggle out of this by arguing that those claims "are based on different alleged facts and different conduct by Black Cube." (Bloom Mot. 24.) But the Bloom Defendants do not articulate what those are. Indeed, the allegations that the Court cited in finding that agency was sufficiently pled for the fraud claims (that Weinstein hired the Bloom Defendants to oversee Black Cube's work, that she engaged in conversations about Black Cube's progress in obtaining McGowan's book, that the unauthorized recordings and copy of the manuscript were shared with the Bloom Defendants) also form the basis for Bloom's agency liability for McGowan's invasion of privacy, IIED, and CDAFA claims.

To be specific, the FAC pleads in Paragraph 92 that the spy inserted in McGowan's life, "Filip[,] was actually Stella Penn Pechanac [and] acted as...BLOOM's, and THE BLOOM FIRM's authorized agent." This is generally sufficient,[6] but because some claims are founded in fraud the FAC goes further to lay out numerous supporting details to satisfy even the Rule 9 pleading standard. For example, Paragraph 97 adds, "Filip was recording MCGOWAN...without her consent in order to compile hours of information that were then shared with...BLOOM…." FAC ¶ 97. Dates of this conduct are in Paragraphs 94-95, 114, 129. The Bloom defendants "listened to hours" of unlawfully recorded excerpts of McGowan's book, then sought more. *Id*. ¶ 117. Bloom personally met with Filip, *id*. ¶ 121, and "guided BLACK CUBE's work." *Id*. ¶ 160(c). Black Cube worked "in order to compile hours of information" to be shared with Movants, *id*. ¶¶ 97, 130. Indeed, its doing so was "a central part of the scheme by...BLOOM….to infiltrate the lives of people seeking to expose WEINSTEIN." *Id*. ¶ 100. Again, Boies was not directing the work alone,

---

[6] "Agency allegations are subject to general pleading requirements…." *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1112 (2009), *as modified on denial of reh'g* (Feb. 3, 2009) (reversing trial court for dismissal on pleadings).

"BLOOM and the BLOOM FIRM joined BOIES...in overseeing BLACK CUBE's work." *Id*. ¶ 74. The FAC also alleges for each of the enumerated counts that Bloom is liable for Black Cube's conduct based on agency. *Id*. ¶¶ 193, 205, 216. This amply pleads agency. *See also Noble v. Sears, Roebuck & Co*., 33 Cal. App. 3d 654, 663 (Cal. Ct. App. 1973) ("[T]he hirer of a detective agency for either a single investigation or for the protection of property, may be liable for the intentional torts of employees of the private detective agency committed in the course of employment.").

Wholly independent of this precedent authorization, the FAC pleads ample facts, which, if proved, establish that ratification occurred. Agency may be created by "subsequent ratification." Cal. Civ. Code § 2307. A principal ratifies an agency "by accepting or retaining the benefit of the act, with notice thereof." Cal. Civ. Code § 2310. That is, a purported agent's act "may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred….'" *Dickinson v. Cosby*, 37 Cal. App. 5th 1138, 1158 (2019) (quoting cases); *see also United Rentals (N. Am.), Inc. v. Avcon Constructors, Inc*., 2014 WL 1270423, at *6 (E.D. Cal. March 25, 2014) (agreeing that ratification may be established circumstantially).

Here, Bloom met with the agent spying on McGowan, used hours of taped exchanges, and "relied upon" the agent's work, including in working with Weinstein. (FAC ¶¶ 176, 121, 216.) Bloom and others further "met in person with reporters to present a dossier that the agents had collected on MCGOWAN." *Id*. ¶ 137. Furthermore, mere failure to discharge an agent after learning of his wrongful acts evinces ratification. *E.g., Dickinson*, 37 Cal. App. 5th at 1158 (citing cases). As cited above, the FAC pleads that Black Cube was reporting to Defendants throughout the period of defrauding McGowan, and it was sent back to obtain more information. This, too, plausibly supports agency. The state-law claims adequately plead vicarious liability.

McGowan adequately pled that the Bloom Defendants are vicariously liable

1  for the actions of Black Cube for Claims V, VI, and VII.

2  **III.   CONCLUSION**

3      McGowan respectfully requests that this Court deny Defendants' motions to

4  dismiss her FAC.

5

6  Dated: May 13, 2021                    Respectfully submitted,

7

8                                          SALVATORE PRESCOTT PORTER &
                                           PORTER, PLLC

9                                  By:   /s/ Julie B. Porter

10                                         Julie B. Porter
                                           Jennifer B. Salvatore

11                                         Sarah S. Prescott
                                           Andrew C. Porter

12
                                           *Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28